**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS**
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | CASE NO: No. 4:18CR-00450 KGB |
| JEREMY YOUNG HUTCHINSON, | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE

Defendant Jeremy Hutchinson, by and through undersigned counsel, respectfully submits this Motion to Dismiss the Indictment with Prejudice.

This case involves the government's systematic failure to protect a criminal suspect's basic constitutional rights. The charges in this case are the result of an investigation that started with an illegal search of Mr. Hutchinson's laptop and ended with the destruction of exculpatory evidence to cover up government misconduct. Ultimately, the government's missteps reveal a pattern of gross misconduct that require this Court to dismiss the indictment with prejudice.

## I.    BACKGROUND

### A.    The Unlawful Search

Jeremy Hutchinson is forty-four years old. Ex. 1, Hutchinson Dec. ¶ 2. He attended college at Harding University and law school at the University of Little Rock Bowen School of Law. *Id.* After earning his J.D. and receiving his law license in 2006, Mr. Hutchinson served as a Senator in the Arkansas State Senate from 2011 to 2018 and held a private law practice. *Id.* ¶ 3. From 2006 to the present, Mr. Hutchinson practiced law in Little Rock with Patton Roberts, PLLC; Steel, Wright, Gray & Hutchinson; and his own firm, the Hutchinson Law Firm. *Id.*

During the summer of 2012, Mr. Hutchinson ended a romantic relationship with a woman (hereinafter referred to as, "Individual-1").  *Id.* ¶ 4.  For a period of time, Mr. Hutchinson allowed Individual-1 to live in a condominium apartment that he rented.  *Id.*  When Mr. Hutchinson discovered that Individual-1 was using and selling illegal drugs in the apartment, he ended the relationship and asked that Individual-1 vacate the property.  *Id.*  Distraught by the revelation that Mr. Hutchinson would no longer provide her with free housing, Individual-1 became angry with Mr. Hutchinson.  In the summer of 2012, Mr. Hutchinson's neighbor, among others, witnessed Individual-1 trespassing on Mr. Hutchinson's property. *Id.* ¶ 5.  The neighbor called Mr. Hutchinson to alert him to Individual-1's presence.  *Id.*  Mr. Hutchinson and his neighbor then witnessed Individual-1 and a male companion stealing a number of items, including clothing, a kayak, and various electronic devices.  *Id.*  Individual-1 also had vandalized Mr. Hutchinson's walls.  *Id.* ¶ 6.  Mr. Hutchinson, fearing that that Individual-1 would become violent if approached, allowed her and her companion to leave the premises with the items.  *Id.* ¶ 5.  To avoid public attention or any altercations, Mr. Hutchinson did not call the police or try to retrieve his items from Individual-1 following the incident.  *Id.* ¶ 6.

In early August 2012, Individual-1 sought to secure continued support from Mr. Hutchinson by using what she perceived as leverage against him: she believed incorrectly that he had been supporting her using money from his Senate campaign accounts.  Individual-1 threatened to tell the FBI about this alleged misconduct.  *Id.* ¶ 10.  On August 20, 2012, Individual-1 followed through on her threat.  Ex. 2, 8/20/2012 Individual-1 Interview.  She went to the FBI office in Little Rock and falsely claimed that Mr. Hutchinson paid her with campaign money despite the fact that she only had done minimal campaign work.  *Id.*  She also alleged that one of Mr. Hutchinson's legal clients, Client-1, had paid him in his capacity as Senator to pass favorable state legislation and not for bona fide legal work.  *Id.*

Individual-1 also produced to the FBI six electronic devices, some of which she had stolen from Mr. Hutchinson's apartment.  Ex. 3, Inventory of Devices from Individual-1.  At the time Individual-1 produced these items, the FBI was well aware of Individual-1's personal animosity towards Mr. Hutchinson, but at no point did the FBI question her authority to access devices even in the face of obvious discord.  From the very first interview with Individual-1 in August, the FBI noted that Mr. Hutchinson was trying to evict her from his condominium and that Individual-1 believed Mr. Hutchinson was "spying" on her through a mutual friend.  Ex. 2, 8/20/2012 Individual-1 Interview.

On August 24, 2012, the FBI case agent asked the Computer Analysis Response Team in the FBI Computer Forensics Laboratory to create mirror "images" of the computers and phones that Individual-1 provided.  Ex. 4, FBI Forensics Lab Case Notes.  Although the FBI Computer Analysis Response Team noted that these devices were obtained with "consent," Mr. Hutchinson never gave consent to search his devices.  *Id.*  Moreover, the government has never provided a Receipt of Property or Consent to Search form for any of the devices Individual-1 produced.

Among the devices the FBI collected from Individual-1 was a Sony Vaio laptop that she stole from Mr. Hutchinson (the "laptop").  *Id.*; Ex. 5, FBI Report of Examination.  The laptop contained a lock screen with password so only Mr. Hutchinson could access its contents.  Ex. 1, Hutchinson Dec. ¶¶ 21, 22.  Furthermore, the laptop contained Mr. Hutchinson's law firm email linked to the Microsoft Outlook application that users could open without having to enter a password.  *Id.* ¶ 21.  The laptop contained confidential and privileged legal files of Mr. Hutchinson's law clients.  *Id.* ¶ 24.  The laptop did not contain any of Individual-1's files.  Individual-1 did not have permission to access the laptop nor did she have Mr. Hutchinson's laptop password.  *Id.* ¶¶ 21, 22.

Just eleven days after delivering the devices to the FBI and while they were being

imaged, Individual-1 confronted Mr. Hutchinson at his home and assaulted him.  Ex. 6, 9/5/2012 Police Report; Max Brantley, *Jeremy Hutchinson's ex-girlfriend arrested for battery in scrap*, Arkansas Times (posted Sep. 5, 2012, 11:35 AM), https://www.arktimes.com/ArkansasBlog/archives/2012/09/05/jeremy-hutchinsons-girlfriend-arrested-for-battery (hereinafter *Ark. Times Article*); Ex. 1, Hutchinson Dec. ¶ 8.  The news reports noted that Individual-1 was angry about perceived promises from Mr. Hutchinson to support her.  *Ark. Times Article*.  Later that month, Individual-1 vandalized the apartment that Mr. Hutchinson had been renting for her and caused upwards of $10,000 worth of damage.  Ex. 7, 10/1/2012 Police Report.

Between October 15 and 17, 2012, after Individual-1 publicly assaulted Mr. Hutchinson and vandalized his apartment, the FBI completed the imaging of the laptop.  Ex. 4, FBI Forensics Lab Case Notes.  It is believed that the electronic devices were thereafter returned to Individual-1.  Ex. 1, Hutchinson Dec. ¶ 26.

In addition, despite widespread public reports of Individual-1's hostility towards Mr. Hutchinson, the government never contacted Mr. Hutchinson prior to searching his computer, and never sought a warrant to search the laptop she stole from him.  Furthermore, though the laptop contained legal files, the FBI did not follow proper protocol to protect files that might have implicated attorney-client privilege, nor or did it seek approval from the U.S. Attorney or Assistant Attorney General or review the privileged materials with a special "taint team" to protect the attorney-client privilege.

The government has since advised that it destroyed the images of electronic devices that it had collected, including Mr. Hutchinson's laptop.[1]  *Id.* ¶¶ 25, 27.  Importantly, the laptop

---

[1] The government has failed to produce a chain of custody log for these images, but the last entry from the FBI notes that the government retained these records until at least December 2013.  *See* Ex. 4, FBI Forensics Lab Case

contained contemporaneous ledgers of Mr. Hutchinson's campaign contributions and expenditures including cash expenditures for his campaign, which are now permanently lost. *Id.* ¶ 23. The computer's mirrored hard drive would have also had have emails from Mr. Hutchinson's law firm account which can no longer be retrieved. *Id.* ¶ 24. Individual-1's devices—images of which were also destroyed—contained valuable evidence regarding her bias and motivation to lie to the government, including her communications about the theft of Mr. Hutchinson's computer and her communications with individuals concerning selling drugs.

## B.     The FBI Investigation

In June 2013, based in large part on Individual-1's false claims, the FBI opened an investigation into whether Mr. Hutchinson used his official position as a state senator to benefit his client, Client-1. Ex. 8, Case Opening Memorandum. One year later, on June 11, 2014, Special Agent Michael Lowe requested that Mr. Hutchinson submit to an interview under the false pretense of helping with the investigation of a different individual. Ex. 1, Hutchinson Dec. ¶ 11. Mr. Hutchinson agreed to cooperate in the investigation of the alleged third party. *Id.* Once the interview began, it quickly became clear that he was not seeking information regarding a third party; Special Agent Lowe was investigating Mr. Hutchinson. Special Agent Lowe confronted Mr. Hutchinson with emails from his ex-wife, tax returns, bank records, and campaign expenditure reports, asking Mr. Hutchinson to explain perceived irregularities and inconsistencies in his records. Ex. 9, 6/11/2012 J. Hutchinson Interview. The emails were likely procured from the unauthorized, unlawful search of Mr. Hutchinson's laptop. Ex. 1, Hutchinson Dec. ¶ 12. In yet another shocking lapse of protocol, Special Agent Lowe did not create an official FBI Witness Interview (Form 302) until forty-eight days after the interview. Ex. 9, 6/11/2012 J. Hutchinson Interview.

---

Notes (noting that the FBI lab gave the devices' images to case agent Special Agent Coleman).

Special Agent Lowe wanted answers concerning Mr. Hutchinson's client, and when Mr. Hutchinson could not provide the information he wanted, Special Agent Lowe grew increasingly frustrated and threatened Mr. Hutchinson with criminal prosecution.  Ex. 1, Hutchinson Dec. ¶ 14.  Special Agent Lowe also promised that, if Mr. Hutchison were cooperative, he could "put the tax and campaign issues on the shelf" and not refer them to the U.S. Attorney's Office.  *Id.* ¶ 13.

Coerced by the threat of prosecution and seduced by the promise of immunity, Mr. Hutchinson told Special Agent Lowe that he knew about potential criminal activity by a state senator, but that his source for the information was privileged.  *Id.* ¶ 14.  Special Agent Lowe pushed on, urging Mr. Hutchinson to reveal this information, stating "go ahead and tell me and we can work around the attorney-client privilege."  *Id.*  Mr. Hutchinson then explained that his client, Rusty Cranford, told him of an attempt by State Senator Jon Woods to extort money from Mr. Cranford.  *Id.* ¶ 15.  The government began an investigation of Mr. Cranford shortly thereafter.  *Id.* ¶¶ 15–18; *see also* Ex. 10, 8/4/2014 R. Cranford Interview.

Seeking to obtain a meeting with Mr. Cranford, Special Agent Lowe spent weeks after the June 11, 2014 meeting guiding Mr. Hutchinson's attempts convince his client to meet with the FBI.  Ex. 1, Hutchinson Dec. ¶ 16. Under threat of prosecution, Mr. Hutchinson scheduled a meeting between Agent Lowe and Mr. Cranford with the understanding that Mr. Hutchinson would represent Mr. Cranford at the meeting.  *Id.*  However, shortly thereafter, another FBI agent, Special Agent Cessario, unexpectedly confronted Mr. Cranford at a different time without Mr. Hutchinson present.  Ex. 1, Hutchinson Dec. ¶ 17. Mr. Cranford called Mr. Hutchinson, and Mr. Hutchinson instructed Mr. Cranford not to answer Special Agent Cessario's questions.  *Id.*  Because of this incident, Special Agent Lowe reversed course and suddenly expressed concern that he had elicited potentially privileged information from Mr. Hutchinson, citing a "potential

for conflict." Ex. 1, Hutchinson Dec. ¶ 18.  Special Agent Lowe suggested to Mr. Hutchinson that Mr. Cranford retain new counsel.  *Id.*

### C.      Closing the Investigation

On February 4, 2015, the FBI allegedly closed its investigation into Mr. Hutchinson.  Ex. 11, Case Closing Memorandum.  Notwithstanding the supposed "closing" of the investigation, the government continued to doggedly pursue Mr. Hutchinson.

Inexplicably, in April 2017, Special Agent Lowe, the same agent that oversaw the illegal searches, destroyed the laptop's image, conducted the coercive interviews, and made false promises of immunity, "reopened" the government's investigation of Mr. Hutchinson.  Ex. 12, Case Re-opening Memorandum.  The government destroyed evidence of its illegal searches and failed to follow protocol from its first leg of the investigation, and then indicted Mr. Hutchinson.

### D.      The Indictment

On August 30, 2018, the government indicted Defendant Jeremy Hutchinson.  Counts One through Eight of the indictment charge Mr. Hutchinson with wire fraud in violation of 18 U.S.C. § 1343.  Counts Nine through Twelve charge Mr. Hutchinson with filing false tax returns in violation of 26 U.S.C. § 7206(1).

The government alleges that Mr. Hutchinson solicited contributions for his State Senate campaign, which he then used for personal expenses.  Indictment of J. Hutchinson, Dkt. 3 ("Indictment") ¶ 17.  It is alleged that he deposited checks intended for his campaign totaling $9,450 into personal accounts and that he debited $340 from his campaign to pay for personal items.  *Id.* ¶ 43.  By spending campaign funds for personal use, the government alleges Mr. Hutchinson obtained this money from donors under fraudulent pretenses.  *Id.* ¶ 43.

With respect to filing a false tax return, the government alleges that Mr. Hutchinson failed to report $79,980 in income for 2011, $60,618 in 2013, and $130,631 in 2014.  *Id.* ¶¶ 45,

46.  The indictment claims that Mr. Hutchinson overreported his income by $12,653 in 2012.  *Id.*

### E.     Summary of Events

A summary of the events relevant to this motion is outlined as follows:

| Date | Event |
|---|---|
| Late July/Early August 2012 | Individual-1 broke into Mr. Hutchinson's condo and stole his laptop and other items. |
| August 7, 2012 | Individual-1 threatened to take the laptop to the FBI. |
| August 24, 2012 | Individual-1 provided the FBI two laptops, two cell phones, and an external hard drive. |
| September 5, 2012 | Individual-1 assaulted Mr. Hutchinson. |
| October 1, 2012 | Individual-1 vandalized Mr. Hutchinson's apartment. |
| Between October 15 and 17, 2012 | Data images extracted from the electronic devices provided by Individual-1 made available to FBI case agents. |
| June 6, 2013 | The FBI initiated a full investigation of Mr. Hutchinson. |
| July 16, 2013 | The FBI began subpoenaing Mr. Hutchinson's bank records. |
| June 11, 2014 | The FBI interviewed Mr. Hutchinson. |
| December 11, 2013 | Last communication from FBI forensic lab regarding laptop. Laptop image turned over to case agent. |
| February 4, 2015 | The FBI closed the investigation of Mr. Hutchinson. |
| Presumed between 2015 and 2017 | The government destroyed images of devices provided by Individual-1. |
| April 3, 2017 | The government reopened its investigation of Mr. Hutchinson. |
| August 30, 2018 | The government indicted Mr. Hutchinson. |

## ARGUMENT

The government has violated Mr. Hutchinson's constitutional rights by illegally searching his laptop, destroying exculpatory and potentially useful evidence from that laptop, and using coercive tactics to illicit involuntary statements from him.  The indictment should be dismissed due to such violations based on the cumulative prejudice to Mr. Hutchinson.  At the very least, evidence from the unlawful search of his devices should be suppressed along with the fruits of that search.

### II.    **The Government Illegally Searched Mr. Hutchinson's Devices and Any Evidence Obtained Thereafter is the Fruit of the Poisonous Tree.**

The government failed to obtain a search warrant for Mr. Hutchinson's laptop at any point after it was obtained from Individual-1 despite many opportunities to do so and failure of

8

any circumstances that could justify a warrantless search.  The purposeful, brazen, and needless violation of Mr. Hutchinson's Fourth Amendment rights warrants dismissal of the indictment.

### A.  Applicable Law

The Fourth Amendment protects "[t]he right of the people to be secure in their . . . houses, papers, and effects[ ] against unreasonable searches and seizures" and generally prohibits the warrantless entry and search of a person's dwelling or property.  U.S. Const. amend. IV; *see also Payton v. New York*, 445 U.S. 573, 587 (1980).  The government must obtain a warrant to search any property in which a suspect has a reasonable expectation of privacy.  *United States v. Jacobsen,* 466 U.S. 109, 113 (1984).

There is no question that Mr. Hutchinson had a reasonable expectation of privacy in the material stored on his laptop.  *See, e.g.*, *Riley v. California*, 134 S. Ct. 2473, 2494–95 (2014) (holding in the cellphone context that, due to the wealth of information that electronic devices "contain and all they may reveal, they hold for many Americans 'the privacies of life'"); *United States v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013) ("Laptop computers, iPads and the like are simultaneously offices and personal diaries" which "contain the most intimate details of our lives: financial records, confidential business documents, medical records and private emails."); *United States v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007) (finding reasonable expectation of privacy in a personal computer); *United States v. Buckner*, 473 F.3d 551, 554 n.2 (4th Cir. 2007) (same); *United States v. Andrus*, 483 F.3d 711, 718 (10th Cir. 2007) ("A personal computer is often a repository for private information the computer's owner does not intend to share with others.  For most people, their computers are their most private spaces.") (internal quotation marks omitted); *United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004) ("Individuals generally possess a reasonable expectation of privacy in their home computers."); *United States v. Al-Marri*, 230 F. Supp. 2d 535, 541 (S.D.N.Y. 2002) ("Courts have uniformly

agreed that computers should be treated as if they were closed containers.").

Under the Fourth Amendment, searches and seizures conducted without a warrant are *per se* unreasonable, unless the government can establish that a warrantless search falls within one of the few specifically established and narrowly defined exceptions to the general warrant requirement. *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993); *Thompson v. Louisiana*, 469 U.S. 17, 19–20 (1984) (per curiam); *Katz v. United States*, 389 U.S. 347, 357 (1967). Many of these exceptions have no applicability here. There are no automobiles involved in this situation (automobile exception), no emergency requiring immediate review of the laptop's contents has been alleged (exigent circumstances), Mr. Hutchinson was never arrested (search incident to arrest), agents had to image the laptop's data to review individual files (plain view), there is no indication that the information the FBI took from the laptop would have inevitably been found elsewhere (inevitable discovery), and the laptop was taken without permission from Mr. Hutchinson's home, not left in a publicly accessible thoroughfare like a sidewalk (abandonment).

The government may argue that a warrant was not necessary because it received valid consent for the search from Individual-1. *See* Ex. 4, FBI Forensics Lab Case Notes (noting that the legal authority for the search was "consent to search"); *see also* Ex. 3, Inventory of Devices from Individual-1. The government bears the burden of proof to establish the existence of effective consent. *Florida v. Royer*, 460 U.S. 491, 497 (1983) (holding that the government has the burden of showing that consent to search was "freely and knowingly given"). When a third party gives consent, the third party must have actual or apparent authority to consent to the search. *Stoner v. California*, 376 U.S. 483, 489 (1984). Third party consent to search property owned or occupied by a prospective defendant may only be obtained from another person who possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see also Coolidge*

*v. New Hampshire*, 403 U.S. 443, 487–90 (1971).   Additionally, the party claiming an expectation of privacy must have assumed the risk that consent might be granted by this other person or entity.  *Matlock*, 415 U.S. at 171 n.7.  Common authority is a function of mutual use, joint access, and control, *United States v. Bradley*, 869 F.2d 417, 419 (8th Cir. 1989), and is a question of fact, *United States v. Baswell*, 792 F.2d 755, 758 (8th Cir. 1986).  Finally, the government could have sought consent or secured a valid search warrant for the information.  It failed to do either.

**B.     The Government Did Not Have Valid Third-Party Consent to Search Mr. Hutchinson's Laptop**

It is undisputed that Mr. Hutchinson himself did not give consent to search his devices.  However, it strains credulity to suggest that Individual-1's consent is valid for Mr. Hutchinson's possessions.

   1. *Individual-1 Did Not have Actual Authority to Give Consent to Search Mr. Hutchinson's Laptop*

It is abundantly clear that Individual-1 did not have actual common authority over the laptop to give proper consent to the government to search it.  In fact, Individual-1 did not have access to *or* control over Mr. Hutchinson's laptop.  First, she did not own or regularly use the laptop.  Ex. 1, Hutchinson Dec. ¶ 22.  Second, she stole the laptop from Mr. Hutchinson's residence in order to obtain access to it.  *Id.* ¶¶ 5, 21.  Moreover, the government knew that Individual-1's purported claim of actual authority was dubious.   In the notes of Agent Lowe upon the first meeting with Individual-1 in August 2012, he notes the pair's animosity, that they lived separately, that Individual-1 was angry with Mr. Hutchinson, and that they were no longer in a relationship.  Ex. 2, 8/20/2012 Individual-1 Interview.   Individual-1 did not have any semblance of actual authority to consent to search Mr. Hutchinson's laptop.

   2. *Individual-1 Did Not Have Apparent Authority to Consent to the Search of Mr. Hutchinson's Laptop*

In addition to lacking actual authority, Individual-1 did not have apparent authority to consent to the search of the laptop.  Apparent authority "is present when the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the [subject of the search]." *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)).  The government bears the burden of proving that it had effective consent.  *United States v. Selberg*, 630 F.2d 1292, 1294 (8th Cir. 1980).

The government cannot meet this weighty burden.  First, the laptop contained files, folders, and email account(s) on the laptop clearly related to *Mr. Hutchinson's* private and professional life (including privileged documents).  This alone should have suggested to agents, in the exercise of reasonable caution, that the laptop was not Individual-1's property, and that they needed a warrant.

Further, it was unreasonable for officers to rely upon Individual-1's representations that she owned the laptop to be searched.  In addition to Agent Lowe's notes indicating Individual-1's apparent anger towards Mr. Hutchinson, public reports made it abundantly clear that Individual-1 was willing to break into Mr. Hutchinson's apartment.  *Ark. Times Article*; Ex. 6, 10/1/2012 Police Report.  A reasonable agent would have concluded that Individual-1 did not have domain over his possessions.  That, if not anything else, should have made the government pause its search of the laptop.

Accordingly, the government cannot meet its burden of proving that Individual-1 possessed actual or apparent consent to search the laptop.  Thus, since there was no consent to search, and no other warrant exception applies, the government conducted an illegal search of Mr. Hutchinson's laptop.

C.    **The Government Did Not Adhere to Protocols for Searching an Attorney's**

12

### Files

The government's failures and misconduct is exacerbated because the files belonged to an attorney.  The Justice Manual ("JM") governs a search by federal prosecutors of the property of an attorney who is a suspect, subject, or target of an investigation.  *See* JM 9-13.420.  The Justice Manual cautions that "it is important that close control be exercised over this type of search" due to the risk of encountering attorney-client privileged information and interrupting the legitimate attorney-client relationship.  *Id.*  Accordingly, the Justice Manual institutes a number of procedural requirements for prosecutors who want to search an attorney's property.  First, "prosecutors are expected to take the least intrusive approach consistent with vigorous and effective law enforcement," which may entail use of a subpoena rather than search warrant.  JM 9-13.420(A).  Second, the U.S. Attorney or the relevant Assistant Attorney General must approve any application for a search warrant.  JM 9-13.420(B).  The Justice Manual notes that "[o]rdinarily, authorization of an application for such a search warrant is appropriate when there is a strong need for the information or material and less intrusive means have been considered and rejected."  *Id.*  Third, the prosecutor requesting a search warrant must consult with the Criminal Division.   JM 9-13.420(C).   If exigent circumstances require a search prior to consulting the Criminal Division, the prosecutor must notify the Criminal Division "as promptly as possible" after the search.  *Id.*  Finally, "[p]rocedures should be designed to ensure that privileged materials are not improperly viewed, seized or retained during the course of the search."  JM 9-13.420(D).  Specifically, a taint team should be designated to ensure that only certain agents and attorneys are exposed to potentially privileged documents.  JM 9-13.420(E); *see also United States v. Neill*, 952 F. Supp. 834, 839–41 (D.D.C. 1997) (noting the importance of a taint team in protecting the attorney-client privilege).

The government brazenly violated the Department of Justice's own guidelines when it

accessed Mr. Hutchinson's computer without proper regard for attorney-client communications. It did not ensure that "close control be exercised over this type of search." JM 9-13.420. Rather, it demonstrated a wholesale disregard for the attorney-client privilege.

Here, despite the absence of any exigent circumstances, the government never obtained a search warrant or a subpoena, and it never obtained authorization for the search from the U.S. Attorney for this district or the relevant Assistant Attorney General. The government never consulted with the Criminal Division or notified the Criminal Division that the search of an attorney's computer took place. Most importantly, the government dove headfirst into Mr. Hutchinson's privileged documents and communications without utilizing a filter team or other third-party review mechanism. This wonton disregard for the attorney-client privilege further demonstrates the unreasonableness of the government's search. Additionally, to the extent the government argues that Individual-1 gave consent to search Mr. Hutchinson's computer—which was insufficient in any event—she could not possibly have given consent to search privileged documents on Mr. Hutchinson's computer.

Although the Justice Manual itself does not convey any specific rights, the government's failure to follow even its own internal guidance further demonstrates that the search, seizure, and destruction of this key evidence was unreasonable and done in bad faith.

### III.    The Government Violated Mr. Hutchinson's Due Process Rights When it Destroyed Evidence in Bad Faith.

This case involves "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). The government's duty to preserve evidence arises both at trial and at sentencing. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Due Process Clause guarantees defendants access to "exculpatory" and "material" evidence. *Valenzuela-Bernal*, 458 U.S. at 868 (citing *Brady*, 373 U.S. at 87). Dismissal of the indictment can be an appropriate remedy if the government violates

14

a defendant's right to due process through destruction of evidence. *See United States v. Williams*, 577 F.3d 878, 882 (8th Cir. 2009).

### A. Applicable Law

The Supreme Court has developed two standards to determine whether the destruction of evidence violates a defendant's right to due process. When *exculpatory* evidence is destroyed, a due process violation arises when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). However, when the exculpatory value of the evidence is undeterminable but the evidence is "*potentially* useful" to the defendant, there is a due process violation when the defendant shows bad faith on part of the government. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

Here, the government both lost an original version of Mr. Hutchinson's laptop and destroyed an image of the laptop that it had created. This laptop and its image contained evidence that was exculpatory and, at a minimum, undoubtedly potentially useful, neither of which can be recovered. In addition, the other devices destroyed belonging to Individual-1 contained exculpatory and potentially useful evidence that go to Individual-1's credibility. The exact reason for the government's mishandling of this evidence is unclear. However, the law *is* clear. This case should be dismissed because of the blatant violation of Mr. Hutchinson's due process rights.

### B. The Government Violated Mr. Hutchinson's Due Process Rights when it Destroyed Exculpatory Evidence

Mr. Hutchinson's laptop and Individual-1's devices contained exculpatory evidence. The evidence lost was essential to the defense, unique, and cannot be recreated or obtained elsewhere. Accordingly, dismissal is warranted.

15

Criminal defendants are entitled to material exculpatory and impeachment evidence to satisfy the constitutional guarantee to a fair trial. *Brady*, 373 U.S. at 87. To this end, the government must disclose all such evidence to the defense. *Id.* In *Brady*, the Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The *Brady* doctrine applies to evidence that completely or partially absolves the defendant of criminal responsibility, information that relates to impeachment of government witnesses, and evidence that could favorably affect the sentence imposed on the defendant. Failure to disclose this evidence is a violation of the defendant's right to due process. *Id.*

The government is not excused of its disclosure obligation merely by losing or destroying evidence. The government's destruction of exculpatory evidence violates an individual's right to due process if the evidence possesses "an exculpatory value that was apparent before the evidence was destroyed," and the evidence is "of such a nature that the defendant would be unavailable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. A court is authorized to dismiss an action if the government violates a defendant's right to due process. *Williams*, 577 F.3d at 882. When the government destroys exculpatory evidence, "the good or bad faith of the prosecution is irrelevant." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004).

Here, the destruction of material, exculpatory evidence violated Mr. Hutchinson's due process rights and warrants dismissal of the indictment. As to Mr. Hutchinson's laptop and laptop image, the government destroyed and lost contemporaneous ledgers that he kept to account for campaign expenses paid for in cash. First, the exculpatory value of this evidence is apparent: such ledgers would refute the government's assertion that Mr. Hutchinson used

16

withdrawals of campaign cash for personal expenses.  *See* Indictment ¶¶ 37–41.  The sheer fact that Mr. Hutchinson kept these ledgers would powerfully rebut the argument that he intended to defraud contributors to his campaign.  *See* 18 U.S.C. § 1343 (noting that one must "intend[] to devise" a scheme to defraud under the wire fraud statute).  The exculpatory value of this evidence, which directly contradicts the allegations against Mr. Hutchinson, should have been apparent to the FBI when reviewing Mr. Hutchinson's computer.  The agents were specifically searching for evidence of campaign finance violations, and would have discovered these spreadsheets.

Second, the defense obviously cannot obtain comparable evidence for the laptop and laptop image.  Mr. Hutchinson housed this exculpatory evidence only on his laptop.  The government has advised that the image of the laptop was destroyed, and the government has not produced any written memoranda memorializing or summarizing the laptop's contents.[2]  Even worse, the government has lost the original laptop.  Incredibly, because the government never created a chain of custody log or prepared a return of evidence form, the government today cannot say with certainty whether this critical evidence was destroyed, misplaced, or returned to Individual-1.  Further, after Special Agent Lowe reopened the investigation, it does not appear that the government ever sought to recover the original laptop that it had previously returned to Individual-1.

In addition to Mr. Hutchinson's laptop, the government destroyed images of Individual-1's devices, which contained a wealth of evidence that goes to Individual-1's credibility.  *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . as well as exculpatory evidence falls within the *Brady* rule." (citing *Giglio v. United States*, 405 U.S. 150,

---

[2] A clear record has not been provided to the defense regarding the destruction of the laptop image, but counsel was advised that the image was destroyed after it had been collected.

WDC 373837924v4

154 (1972))).  Individual-1's devices contained evidence that she had stolen Mr. Hutchinson's laptop and was making threats against him.  Evidence would have also shown that Individual-1 was dealing and using illicit drugs, which prompted Mr. Hutchinson to evict her.  Thus, Individual-1 certainly had a bias against Mr. Hutchinson.  Ex. 1, Hutchinson Dec. ¶ 4.  Evidence of this activity should have been apparent after an agent reviewed the information on her devices, the exculpatory nature of which was plain—this evidence demonstrates her bias against Mr. Hutchinson and motivation to fabricate stories about him.

The defense cannot obtain existing evidence comparable to Individual-1's own activity and statements contemporaneous with her decision to tell fabricated stories about Mr. Hutchinson to the FBI.  By its own admission, the government destroyed images of the devices.  *Id.* ¶ 25.  But, the original devices appear to be gone as well.  The government conducted a second collection of devices from Individual-1 in 2017 and only one of those devices (an Apple Powerbook G4) corresponds with the earlier devices collected.  *Compare* Ex. 4, FBI Forensics Lab Case Notes ("QLR3 - Apple PowerBook G4 laptop, serial# W8531130RG3" and "QLR3 I - Fujitsu 80GB HDD, serial# NP0PT572CCK3"), *with* Ex. 13, 10/5/2017 Request for Assistance in Data Recovery ("[A] 80GB hard drive serial# NP0PT57 2CCK3 removed from an Apple PowerBook G4 laptop.").

The government reviewed material, exculpatory evidence regarding Mr. Hutchinson, and then destroyed and lost that evidence.  This was not simply a lone oversight by FBI agents, but instead constituted—at best—a pattern of complete disregard for Mr. Hutchinson's rights. Accordingly, because the government violated Mr. Hutchinson's right to due process, the indictment in this case should be dismissed.

### C.     The Government Violated Mr. Hutchinson's Due Process Rights when it Destroyed Potentially Useful Evidence In Bad Faith

In addition to exculpatory evidence, the destroyed devices contained a wealth of evidence

that was potentially useful for the defense.  By willfully destroying potentially useful evidence in bad faith, the government violated Mr. Hutchinson's due process rights.

In *Youngblood*, the Supreme Court addressed the prerequisites for the dismissal of a case when that evidence is potentially useful, rather than exculpatory.  488 U.S. at 58.  Potentially useful evidence is distinguishable from *Brady* material in that the exculpatory value of the evidence is undetermined or undeterminable.  *Id.* at 57 (finding that destroyed samples that were subject to government testing were potentially useful because "it could have been subjected to tests, the results of which might have exonerated the defendant").  Since the exculpatory value is unclear, a due process violation occurs when the defendant shows the destruction was in bad faith.[3]  *Id.* at 57.

Though *Youngblood* did not elaborate on the meaning of bad faith, the Court equated bad faith with the government's knowledge or wrongful intent.  *See* 488 U.S. at 56 n.* (describing the "bad faith" requirement as mandating that the defendant demonstrate that "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant" that "must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed").  Many Circuits have established balancing tests to assess bad faith.  *See, e.g.*, *United States v. Bohl*, 25 F.3d 904, 911 (10th Cir. 1994) (employing a five factor tests that turns on the knowledge of the exculpatory value of the evidence at the time of destruction).  While the Eighth Circuit has not established its own bad faith test, it has held that the defendant must show more than mere negligence on behalf of the government.  *United States v. Iron Eyes*, 367 F.3d 781, 786 (8th Cir. 2004).  Courts in this Circuit have also held that

---

[3] The Court still has the power to impose sanctions for governmental discovery infractions even if it finds no bad faith.  Fed. R. Crim. Pro. 16; *see also United States v. Davis*, 244 F.3d 666, 673 (8th Cir. 2001) (affirming district court's decision to exclude evidence as a sanction without finding bad faith on the government's part).

when an agent proffers an implausible or shifting explanation for deleting evidence, this can lead to a bad faith finding.  *See United States v. Woods*, 319 F. Supp. 3d 1124, 1151 (W.D. Ark. 2018) (hereinafter *Woods I*) (finding bad faith existed when FBI agent "wiped" a laptop without credible explanation).[4]

As stated in Section III.B., *supra*, the evidence lost related to both ledgers and emails kept by Mr. Hutchinson and impeachment evidence related to Individual-1.[5]   If the Court determines that the exculpatory value of this evidence is undeterminable, the government *still* violated the Due Process Clause by losing and destroying this evidence in bad faith. *Youngblood*, 488 U.S. at 57.

The instant case goes beyond mere negligent record keeping.   Not only did the government lose original, critical evidence of Mr. Hutchinson's laptop and Individual-1's devices, it subsequently destroyed copies of the evidence,[6] destroyed or failed to create a chain of custody logs for this evidence, and did not record any summaries or findings regarding files contained within this evidence.  The government's actions alone ensured that the defendant could never use what it had found, which demonstrates its bad faith in failing to preserve this crucial evidence.  *Compare Woods I*, 319 F. Supp. 3d at 1151 (finding bad faith where a government

---

[4]  The indictment ultimately survived a motion to dismiss because the defendant had in his possession the destroyed tapes at issue, therefore the court found there was no prejudice.  *Woods I*, 319 F. Supp. 3d at 1151.  Nonetheless, the court strongly admonished the government's actions, and sanctioned the government for its conduct.  *Id.* (suppressing evidence affected and limiting witness testimony).  The issue of whether dismissal was an appropriate is currently on appeal.  *United States v. Woods*, Case No. 18-3057 (8th Cir. Sep. 26, 2018) (hereinafter *Woods II*).

[5]  Though Mr. Hutchinson specifically remembers these two pieces of critical evidence, the government's actions have made it impossible to remember the full scope of evidence that may be potentially useful to him contained on these devices.  Thus, Mr. Hutchinson reserves his right to supplement this motion with other evidence that may come to light during these proceedings.

[6]  Though the defense requested "any established policy or procedure, either by custom or in writing, regarding the retention/destruction of evidence" on December 7, 2018, the government has not provided any local policy reflecting these practices to date.

actor intentionally destroyed evidence), *with United States v. Espejo*, Case No. 17-3562 (8th. Cir. January 4, 2019) (slip opinion), at 6 (finding no bad faith where a *third-party* unintentionally destroyed evidence that could be obtained elsewhere).[7]

The government's actions after receiving the original laptop were wholly inappropriate. Any reasonable agent would have known that the laptop did not belong to Individual-1, because it contained Mr. Hutchinson's files. *See* Ex. 1, Hutchinson Dec. ¶¶ 21–24. Rather than taking the simple step of seeking consent from the computer's true owner, Mr. Hutchinson or securing a valid search warrant, the government pressed forward with a clearly invalid and improper search.[8] *See* Section II, *supra*. Moreover, the government returned the original laptop to a person who was not its proper owner (and in fact, a thief) and also openly hostile to Mr. Hutchinson. The government appears to have made no effort to retrieve Mr. Hutchinson's laptop after it realized its error. The laptop is distinct in this regard; the government re-subpoenaed records and again collected devices from Individual-1—but it did not make any effort to retrieve the laptop at issue. *See Tran v. Kernan*, No. 17cv2132-L-MDD, 2018 U.S. Dist. LEXIS 112160, at *33 (S.D. Cal. July 5, 2018) (noting that the Ninth Circuit has held that *Trombetta* imposes a duty to collect potentially exculpatory evidence) (citing *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989); *Cooper v. Calderon*, 255 F.3d 1104, 1113 (9th Cir. 2001)). The glaring absence of a chain of custody log, receipt or return of evidence form, consent to search, or proof of destruction demonstrates the government's wrongful intent to conceal its conduct and any

---

[7] Relevant to this finding is that the case agent who acted in bad faith in *Woods* (Agent Cessario) has been actively involved in the instant investigation.

[8] It should be noted that the government has not produced a valid Consent To Search Form for the laptop or any of Individual-1's devices. The Form would confirm whether Individual-1 indeed "consented" to search Mr. Hutchinson's laptop and whether she limited her consent to search each device in any way.

information about the original laptop.[9]   It all but ensured the destruction of this critical, useful evidence.[10]

Second, the government must have known that the laptop contained potentially useful evidence immediately because it chose to image the laptop only a few days after it was received. The FBI confirmed its knowledge of the laptop's value when Special Agent Lowe confronted Mr. Hutchinson with some of the material extracted from the laptop image a year and a half after the laptop was imaged.  Ex. 1, Hutchinson Dec. ¶ 12; Ex. 9, 6/11/2014 J. Hutchinson Interview; Section I.B., *supra*.  The government demonstrated that the laptop's contents would be relevant in this case, yet destroyed the image anyway.

With this pattern of behavior, government agents "themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."  *Youngblood*, 488 U.S. at 56 n.*.[11]  Thus, the government acted in bad faith when it lost and destroyed this evidence, and as such, violated Mr. Hutchinson's due process rights to a fair trial.   In effect, the day the government destroyed the evidence, it irrevocably determined that this case could not be pursued. For this reason, the indictment should be dismissed.

### IV.   Mr. Hutchinson's Statements to the FBI were Involuntary.

The Fifth Amendment prohibits the government from using a defendant's statement against him when a law enforcement officer obtained that statement through coercive means. *See Mincey v. Arizona*, 437 U.S. 385, 398 (1978).  The Fifth Amendment provides this

---

[9] It should be noted that a chain of custody log exists for other evidence collected during this first investigation, such as bank records.

[10] A reason that the government destroyed this evidence could be that the government wanted to conceal its illegal search of Mr. Hutchinson's laptop.  *See* Section II, *supra*.

[11] In addition, even if the government's loss or destruction of evidence falls short of violating a defendant's constitutional rights, a court may still order protective rulings or sanctions.  *Davis*, 244 F.3d at 673.

protection because "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

When the law enforcement officer's coercive tactics overcome the defendant's free will, the defendant's statements become involuntary. *See United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) ("A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." (citation omitted)). To determine whether a confession is involuntary, the court views the totality of the circumstances—to include the conduct of the officer and the characteristics of the accused. *Id.* Here, Special Agent Lowe employed deception and made promises of leniency. These coercive tactics overcame Mr. Hutchinson's will and impaired his capacity for self-determination.

First, Special Agent Lowe deceived Mr. Hutchinson and lured him to the FBI field office. Extreme forms of deception or chicanery by the police may be sufficient to render a confession involuntary "when other aggravating circumstances [are] also present." *United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010). In this case, Special Agent Lowe's use of deception was extreme. He used Mr. Hutchinson's friendship and assistance to Agent Bohling as a lure. This deception set a coercive tone for the interrogation. Then, Special Agent Lowe's continued use of coercive tactics during the interrogation aggravated this initial deception.

Special Agent Lowe's next coercive tactic involved a promise of leniency. It is improper for a police officer to obtain a statement through an express or implied promise of leniency. *See Brady v. United States*, 397 U.S. 742, 754 (1970) (citing *Bram v. United States*, 168 U.S. 532, 542–43 (1897)). The Sixth Circuit has identified a specific concern with promises of leniency when they are illusory or broken. *See United States v. Johnson*, 351 F.3d 254, 260

(6th Cir. 2003). They are particularly "problematic if a police officer leads a defendant to believe that he will receive lenient treatment when this is quite unlikely, and makes a promise, without authorization by the prosecution." *United States v. Siler*, 526 F. App'x 573, 575 (6th Cir. 2013) (internal quotation marks and citation omitted).

In *Siler*, the law enforcement officer made several misleading statements and promises of leniency to include a promise not to go to the prosecutors with the defendant's case. 526 F. App'x at 576. The officer then broke that promise and turned the defendant over to the federal prosecutors. *Id.* The court concluded that the officer's conduct was objectively coercive. *Id.*

Here, Special Agent Lowe's promise to put Mr. Hutchinson's issues "on the shelf" is equally as problematic as the promise in *Siler*. Special Agent Lowe knew that his promise was broken as he made it. Reports from the case file indicate that a federal prosecutor was assigned to the investigation as early as June 2013. Special Agent Lowe led Mr. Hutchinson to believe he would receive "lenient treatment" when that was "quite unlikely"—in fact, impossible—because the promise of leniency already was broken. *See Siler*, 526 F. App'x at 575. This promise of leniency and the deceptive lure to the field office were objectively coercive.

Under the totality of the circumstances, Special Agent Lowe's tactics overcame Mr. Hutchinson's will. Indeed, Special Agent Lowe impaired Mr. Hutchinson's capacity for self-determination from the start of the interrogation. Special Agent Lowe deprived Mr. Hutchinson of the ability to choose whether to participate in the interrogation when he lured Mr. Hutchinson there under false pretenses. And Special Agent Lowe's promise of leniency was plainly coercive.

Mr. Hutchinson's actions demonstrate that his will was overborne. Undoubtedly, Mr. Hutchinson was ready and willing to cooperate, but initially it did not seem that he could.

Special Agent Lowe insisted that Mr. Hutchinson inform him of events of which Mr. Hutchinson had no knowledge, and Mr. Hutchinson refused to falsely implicate Client-1.  So, Mr. Hutchinson offered to provide information about Senator Jon Woods and Rusty Cranford.  While the mere fact that Mr. Hutchinson offered to provide other information does not show that his will was overborne, the fact that he provided about 20 confidential reports over the next two years showed that Mr. Hutchinson was relying on Special Agent Lowe's promise of leniency.  This case demonstrates precisely why the Fifth Amendment condemns promises of leniency.  If a person believes that cooperating will prevent further legal action against him, he will make statements he might have not otherwise made.

At bottom, "[t]he abhorrence of society to the use of involuntary confessions . . . turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York*, 360 U.S. 315, 320–21 (1959).  Special Agent Lowe's actions were particularly reproachful.  He lured Mr. Hutchinson to the FBI field office under the guise of assisting him like Mr. Hutchinson assisted another special agent.  When it was clear Mr. Hutchinson was the subject of investigation, Special Agent Lowe promised him leniency when Special Agent Lowe knew that promise was already broken.  Then, Special Agent Lowe benefitted from Mr. Hutchinson's numerous confidential reports from 2014, throughout 2015, and into 2016.  In the totality of the circumstances, these coercive tactics overcame Mr. Hutchinson's will.[12]  Accordingly, Mr. Hutchinson's statements were involuntary.

## V.    The Sum of the Government's Misconduct Requires Dismissal.

---

[12] It should be noted that Special Agent Lowe only presented Mr. Hutchinson with a partial record of his taxes and campaign expenditures.

Taken together, the government's blatant violations of Mr. Hutchinson's Fourth Amendment rights, intentional destruction of records, inexplicable failures to follow protocol, and duplicitous interrogation tactics require dismissal of the indictment. *United States v. Tulk*, 171 F.3d 596, 599 (8th Cir. 1999) ("It is certainly true that factors to consider in assessing prejudice include the *cumulative* effect of any misconduct.") (emphasis added).

Federal courts have inherent "supervisory powers," which include the power to dismiss an indictment or reverse a conviction. *See United States v. Hasting*, 461 U.S. 499, 505 (1983) (recognizing authority to reverse a conviction); *United States v. Simpson*, 979 F.2d 1282, 1289 (8th Cir. 1992), *abrogated on other grounds*, 548 U.S. 1 (2006) (recognizing authority to dismiss charges). "The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct." *Hasting*, 461 U.S. at 505 (internal citations omitted). Courts may exercise their supervisory powers even where there has not been a constitutional violation. *United States v. Blom*, 242 F.3d 799, 803 (8th Cir. 2001) ("We have supervisory power to order a new trial in federal cases for reasons that do not amount to a due process violation.").

Additionally, the Eighth Circuit has recognized that "[o]utrageous government conduct that shocks the conscience" can violate the due process clause of the Fifth and Fourteenth Amendments and "require dismissal of a criminal charge, but only if it falls within the narrow band of the most intolerable government conduct." *United States v. Morse*, 613 F.3d 787, 792–93 (8th Cir. 2010) (quoting *United States v. Boone*, 437 F.3d 829, 841 (8th Cir. 2006). The Court of Appeals has "recognize[d] due process bars the government from invoking judicial process to obtain a conviction when the investigatory conduct of law enforcement agents is outrageous." *United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir. 1990), *rev'd on other*

*grounds*, 503 U.S. 540 (1992).

The cumulative effect of the government's willful disregard for Mr. Hutchinson's constitutional rights requires dismissal of the indictment.  Dismissal of the indictment would remedy the government's outrageous violations of Mr. Hutchinson's rights and uphold the basic principles of fairness and governmental integrity.

Specifically, the government had no excuse to illegally search Mr. Hutchinson's laptop and then keep the fruit of an illegal search.  At no point did the government even attempt to remedy its search by seeking a warrant; on the contrary, it boldly used the illegally-obtained contents of the laptop to elicit statements from Mr. Hutchinson.  The government's shifting explanations of its basis for the search—years after it had knowledge of the search's illegality— reveals a tacit admission that the search was improper.  *See* Ex. 1, Hutchinson Dec. ¶ 20 (noting that the government first claimed that it had consent of Individual-1 and then, incredibly, claimed that the laptop was abandoned).  Moreover, the government willfully destroyed many of the records surrounding the laptop, which prejudices Mr. Hutchinson's ability to challenge illegally obtained evidence prompted by the search of the laptop.  The government should not be permitted to use tainted evidence simply because it can now claim that there is no record it used the laptop for anything.

The government compounded the violation of its illegal search by losing the electronic devices collected and destroying the devices' images.  These wrongful actions prevented Mr. Hutchinson to use crucial evidence to rebut the allegations in the indictment.  In essence, if the indictment were to stand, the government would be able to select items (and related, subsequent evidence) from the laptop that would tend to prove Mr. Hutchinson's guilt of the crimes charged and discard the evidence that proved his innocence.  Permitting the government to present its case with this incomplete depiction of the facts severely prejudices Mr. Hutchinson's ability to

mount a defense.

If that were not enough, the FBI promised leniency to Mr. Hutchinson on these exact counts if he chose to give the FBI information.  The government should not be permitted to extract information it desires with false promises of leniency, only to bring those charges after it gets what it wants.  Moreover, Mr. Hutchinson relied on those promises of leniency to his detriment: he provided the FBI with valuable information only to be left with nothing in return.

The government's needless constitutional violations have severely prejudiced Mr. Hutchinson's ability to defend himself in this action.  Without a full inventory of the laptop's files, it is difficult to articulate the importance of the abundance of evidence contained on the laptop.  Should the Court allow this indictment to stand, it will present a blueprint for government misconduct.  The government would be able to seize a wealth of personal files without consent, peek behind the curtain, use this wrongfully-obtained information to investigate, then destroy the original files and any record thereof—leaving criminal defendants in the impossible position to prove the existence of the illegal search's fruits and exculpatory evidence destroyed.  Such a method runs afoul of the rights the Fourth and Fifth Amendments were designed to protect.

Though the Court should not use its inherent dismissal powers lightly, the instant case warrants a sharp rebuke to the government's overreach.  The indictment should be dismissed.[13]

### VI.    In the Alternative, an Evidentiary Hearing Should Be Granted to Determine the Fruit of the Poisonous Tree and Any Such Fruit Should be Suppressed.

Though the appropriate remedy for the sum of the government's misconduct is

---

[13] Though the exclusionary rule envisions suppression of evidence as a remedy, it should be noted that since the government destroyed the laptop image and did not produce any findings from the laptop, it is difficult to assess how much evidence was the fruit of the illegal search.  While the defense notes specific pieces of evidence that are tainted in Section VI, *infra*, and argues that it needs an evidentiary hearing to assess the scope of the evidence tainted, the breadth of tainted evidence may indeed be too substantial for this case to proceed.

dismissal, in the alternative, the Court should suppress any evidence obtained as a result of the illegal search. Since the government has lost and destroyed the direct evidence of the illegal search (the laptop and its image), this Court should allow an evidentiary hearing to determine the full universe of evidence deriving from from the government's illegal search of the laptop.

Since the search was illegal, the exclusionary rule requires that all evidence stemming from this search must be suppressed. *See Weeks v. United States*; 232 U.S. 383 (1914); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).[14] The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." *Segura v. United States,* 468 U.S. 796, 804 (1984) (citations omitted). "Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002) (citing *Wong Sun*, 371 U.S. at 485). While the defendant "bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence," *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007), once that showing is made, the burden falls on the government to show the evidence is untainted, *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011) (citing *Alderman v. United States,* 394 U.S.

---

[14] *See, e.g.*, *United States v. Villa-Gonzalez*, 623 F.3d 526, 535 (8th Cir. 2010) (upholding suppression of evidence discovered during a warrant search of a residence when "[Defendant] was illegally seized without reasonable suspicion, which led directly to his phone conversation with [a confederate] about the details of his immigration to the United States. The phone conversation supplied the only basis to arrest [Defendant], and the arrest led directly to [Defendant's] subsequent [confession]. Finally, the warrant application to search [Defendant's] residence for the fraudulent documents was supported by [Defendant's] admissions to [the confederate]."); *United States v. Alvarez-Manzo*, 570 F.3d 1070, 1077–78 (8th Cir. 2009) (holding that a defendant's voluntary consent to search his bag did not purge the taint of unconstitutional seizure of the bag and the defendant himself); *United States v. Mosley*, No. CR14-3030-MWB, 2014 WL 5454575, at *9 (N.D. Iowa Oct. 27, 2014) ("The affidavits submitted in support of the search warrants for [the defendant's] house and bank accounts included both tainted and untainted evidence. After excluding the tainted evidence, there is insufficient evidence to provide a neutral magistrate with probable cause to search either the [defendant's] house or his bank accounts."); *United States v. Preston*, No. CRIM. 11-129(1) DWF, 2012 WL 3052903, at *5 (D. Minn. July 26, 2012) (finding an unconstitutional search and holding that "everything that occurred subsequent thereto must be suppressed as the fruit of an illegal search").

165, 183 (1969)).

When there are "definite, specific detailed and nonconjectural" matters related to the validity of a search, a court may grant an evidentiary hearing to assess contested issues of fact. *United States v. Losing*, 539 F.2d 1174, 1179 (8th Cir. 1976). "[T]he determination of whether a hearing is required is necessarily dependent upon the particular facts which attend a particular request, and the district court is properly left with a certain amount of discretion in this regard." *Id.*

An evidentiary hearing is appropriate here to assess how much evidence was collected as a result of the illegal search. Mr. Hutchinson cannot himself determine the full universe of evidence that derived from the illegal search of the laptop because the government lost the original laptop, destroyed the laptop image, and failed to preserve any record of who accessed the laptop or laptop image and when an individual did so. *See* Section III.B., *supra*. However, evidence collected from the laptop must have influenced the collection of subsequent evidence. The laptop was one of the first pieces of evidence the government collected. *See* Section I.A., *supra*. The government subsequently investigated the case for eight months before formally beginning an investigation. *See* Ex. 8, Case Opening Memorandum. It is only reasonable that the government would have pursued a great portion of this evidence based on its review of the laptop.

Moreover, there was a direct factual nexus between the illegal search and much of the evidence the government collected subsequently against Mr. Hutchinson. First, the government collected documents directly from Mr. Hutchinson's devices. Mr. Hutchinson was confronted with evidence in his June 2014 interview that could only have been obtained from the laptop. For example, Special Agent Lowe presented Mr. Hutchinson with email correspondence from his ex-wife. *See* Ex. 1, Hutchinson Dec. ¶ 12. The government has not produced any

documentation indicating that the email correspondence was subpoenaed or submitted to the government by Mr. Hutchinson's ex-wife.

Second, with the unlawfully obtained documents in hand, Special Agent Lowe attempted to elicit a confession from Mr. Hutchinson.  Mr. Hutchinson made no such confession; however, Special Agent Lowe was able to pressure Mr. Hutchinson into continuing to sit for the interview. Mr. Hutchinson would not have continued to sit for the interview had he not been confronted with materials from the laptop.  Agent Lowe continued using this tactic, as Mr. Hutchinson subsequently met with the FBI multiple times.

Third, the government obtained bank records as a direct result of illegal search.  From July 16, 2013 to October 1, 2013, the government issued three subpoenas for documents for Mr. Hutchinson's bank records documents from Bank of America, First Security Bank, and Centennial Bank.  Only after the government had ample time to review the information on Mr. Hutchinson's laptop, which included information about his tax returns and expenditures, did the government subpoena these records.  *Compare* Ex. 4, FBI Forensics Lab Case Notes (indicating the laptop was imaged in October 2012), *with* Ex. 14, Bank of America Subpoena (demonstrating that the first bank records subpoena was issued in July 2013).  The government had no other source of information that would have lead it to subpoena bank records.[15] Accordingly, this evidence is the fruit of an illegal search as well.  *See Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir. 1987) (noting that the exclusionary rule requires suppression of indirect evidence resulting from the illegal search).

---

[15] While the government had conducted interviews with and obtained evidence from Individual-1, the value of this information was limited.  Individual-1's credibility was an issue given her bias against Mr. Hutchinson.  *See Ark. Times Article*; Ex. 6, 10/1/2012 Police Report. The only documentary evidence she provided were checks that appeared to be forgeries, blank or simply unrelated to her claims of campaign finance violations.  In short, Individual-1's word alone would not have been enough reason to subpoena Mr. Hutchinson's bank records.

WDC 373837924v4

The government cannot meet its burden of showing that a great deal of evidence collected was not tainted.  There was ample time to seek Mr. Hutchinson's consent to search the computer or to seek a warrant to search it.  Despite that, the government chose to push forward with an illegal search.  Accordingly, this Court should grant an evidentiary hearing to assess the scope of evidence tainted by the illegal search in the event that the Court denies the instant motion to dismiss.

## CONCLUSION

For the foregoing reasons, and those set forth in the moving briefs, the defense respectfully requests that the Court grant its motion to dismiss the indictment with prejudice or, in the alternative, suppress evidence following an evidentiary hearing.

WDC 373837924v4

Dated: February 7, 2019                    Respectfully submitted,


                                           /s/ Timothy O. Dudley
                                           Timothy O. Dudley
                                           Bar Number 82055
                                           114 South Pulaski
                                           Little Rock, AR 72201
                                           Telephone: (501) 372-0080
                                           Email: TODudley@swbell.net

                                           Marc L. Mukasey (*pro hac vice pending*)
                                           875 Fifth Avenue #10D
                                           New York, NY 10065
                                           Telephone: (347) 527-3940
                                           Email: marc.mukasey@me.com

                                           Nathan J. Muyskens (*pro hac vice pending*)
                                           GREENBERG TRAURIG, LLP
                                           2101 L Street NW
                                           Suite 1000
                                           Washington, DC 20037
                                           Telephone: (202) 331-3100
                                           Facsimile: (202) 331-3100
                                           Email: muyskensn@gtlaw.com
                                           *Attorneys for Defendant Jeremy Young Hutchinson*

WDC 373837924v4

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Timothy O. Dudley

on this 7th day of February, 2019.

WDC 373837924v4