IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 4:18CR00450 KGB |
| | ) | |
| JEREMY YOUNG HUTCHINSON | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT HUTCHINSON'S MOTION TO DISMISS DUE TO GOVERNMENT MISCONDUCT AND MOTION TO SUPPRESS

The United States of America, by and through the United States Attorney for the Eastern District of Arkansas, Cody Hiland, through the undersigned Assistant United States Attorneys, and the Public Integrity Section of the U.S. Department of Justice, Criminal Division, through Acting Chief AnnaLou Tirol and the undersigned Trial Attorney, respectfully requests that the Court deny Defendant Hutchinson's Motion to Dismiss Due to Government Misconduct and Motion to Suppress.

The Defendant, Jeremy Young Hutchinson ("Hutchinson" or "the Defendant"), is charged with stealing over $150,000 in campaign contributions and lying on his taxes. He argues that the government's investigation is flawed because: (1) the FBI searched a computer based upon the consent of his former girlfriend—a computer that she not only claimed and which evidence corroborates was her own, but one which, even accepting the Defendant's unsupported claims as true, he admits he abandoned; (2) the FBI disposed of a forensic copy of the laptop and all other electronic evidence after initially closing the investigation and pursuant to its standard procedures; and (3) the FBI "promised" the Defendant "leniency" when he confessed to his crimes, which, the Defendant alleges, rendered his confession involuntary. The Defendant's manufactured claims, asserted in an effort to avoid the substance of the charges against him, fail in turn. The search was properly conducted with consent of the actual or apparent owner of the laptop; and the FBI's later

1

disposal of the forensic image was not in bad faith.  Moreover, even assuming, *arguendo*, the Defendant had a privacy interest in the laptop, he clearly abandoned it.  Finally, the Defendant, who is an attorney and admits he understood he did not have immunity from prosecution, freely and voluntarily confessed his crimes.

## I.   FACTUAL BACKGROUND

### A.   Individual-1 Reports a Crime to the FBI and Consents to a Search

On or about August 20, 2012, Individual-1, a romantic partner of Hutchinson, arrived at the Little Rock office of the FBI to report specific allegations of state campaign finance fraud and a bribery scheme involving Hutchinson.  *See* Exhibit 1 (FBI 302, August 20, 2012).  She reported that she had been in a relationship with Hutchinson from the time she moved into a condo owned by Hutchinson's parents[1] until July 2012.  *Id*. at 1.  She explained to FBI agents that Hutchinson arranged for payments to be made to her through a third party and from Hutchinson's campaign account, but that he later provided her money from other sources.  *Id*. at 1-3.  During that report to the FBI, Individual-1 related that she had electronic evidence in her possession that would support the claims against Hutchinson.   *Id*. at 3.

On or about August 24, 2012, Individual-1 supplemented her previous report to the FBI as well as provided FBI Agent J.T. Coleman of the Little Rock Field Office with a Sony VAIO laptop, an Apple Powerbook G4 laptop, an iPhone 4, an HTC 65035 cellular telephone, and a Seagate external drive.  *See* Exhibit 2 (FBI 302, August 24, 2012); Exhibit 3a (FBI 302, August 24, 2012); *see also* Exhibit 3b (email dated June 28, 2012).  Individual-1 executed a consent to search form for the devices.  *See* Exhibit 3 (signed consent to search form); Exhibit 4 at p. 31-33 (Individual-1

---

[1] Electronic evidence recovered in this case indicates that Individual-1 sent emails about the lease for this condo in September 2010.

Testimony).[2]  According to Individual-1, every device she turned over to the FBI belonged to her. *See* Exhibit 4 at p. 31-33.   According to the consent to search form, Individual-1 was advised of the right to refuse consent and voluntarily authorized the FBI "to take any items which they determine may be related to their investigation."  Exhibit 3.

According to handwritten notes taken by an FBI CART Examiner, Individual-1 provided specific information concerning what would be found on the devices, including "voice recordings on [a] laptop."  Exhibit 12 at p. 7.  Individual-1 also provided the FBI with several passwords to access the devices.  *Id.*  The contemporaneous notes of the forensic examiner indicate that Individual-1 also knew and noted that there may be more than one user account on one of the computers.  *Id.*

Individual-1 was in physical possession of the laptops, had knowledge of the passwords associated with the devices, and made representations regarding specific content that would be contained within the laptops. Further, additional evidence obtained by the United States during the course of its investigation contradicts Hutchinson's Declaration and supports the proposition that the laptops belonged to Individual-1, and that she had actual authority, or at a minimum common or apparent authority, to consent to a search of the laptops, including, but not limited to, the following:

1.  On June 19, 2012, Hutchinson sent an email to Individual-1 stating, in pertinent part, "Did you tell them how much I had given you. . . . Did you tell them I've spent 300,000 dollars

---

[2] Contrary to claims advanced by Hutchinson in his Motion, the United States previously produced the August 24, 2012, consent to search form signed by Individual-1, on November 28, 2018.  *See* Exhibit 3 (Bates US-000323697). Moreover, on February 1, 2019, defense counsel requested a "chain of custody log that details when and who deleted the imaged hard drive," among other information and items.  Before the United States could formally respond to Hutchinson's request, he filed his Motion on February 7, 2019.  Following requested clarifications by the United States and a meet and confer between the parties on February 11, 2019, the United States produced the chain of custody log regarding the imaged hard drive on February 19, 2019, along with other requested items.  *See* Exhibit 32.

on you (I'm sure they'd love that). Did you tell them you have **2 computers**, 2 kayaks, 2 iPads, 2 phones." *See* Exhibit 5 (June 19, 2012 email) (emphasis added).

2. On February 5, 2012, in a text message between Individual-1 and Hutchinson, Hutchinson states in pertinent part, "I've tried to take care of every one of your material needs and I make sure you have cable and phones and multiple iPads and **computers** . . ." *See* Exhibit 6 (February 5, 2012 text message) (emphasis added).

3. On September 20, 2011, Individual-1 received an email from Sony with the subject line "What If Your Sony VAIO Laptop Went Missing?" Exhibit 7 (September 20, 2011 email). The email references Individual-1 previously registering the Sony VAIO computer further stating, "When you registered your VAIO® PC with us, you automatically received 1 free year of Sony Lost & Found . . ." *Id*.

4. On October 19, 2010, Individual-1 sent a picture to Hutchinson of an Apple laptop with the subject line "Me and my apple," stating "A apple a day keeps the pc's away!!" *See* Exhibit 8 (October 19, 2010 email). Individual-1 later sent Hutchinson an email with the subject line "New fake tattoos" showing the Apple laptop with a drawing and a sticker. *See* Exhibit 9 (October 19, 2010). Hutchinson responded stating, "I can never give that computer back, which is exactly what your plan was…" *See* Exhibit 9a (October 19, 2010 email).[3]

---

[3] The United States notes that Individual-1 previously testified under oath that every device she turned over to the FBI belonged to her and that Hutchinson's claim that she had the devices without his authorization "is absolutely false." *See* Exhibit 4 at p. 33. The FBI recently communicated with Individual-1 again following the filing of Hutchinson's Motion in an attempt to determine whether she had any additional information about the Sony laptop. She adamantly denied stealing the Sony laptop. *See* Exhibit 4a.

## B.    FBI's Search of the Electronic Devices

In late August and early September 2012, the electronic devices were received and imaged by the FBI CART team.  *See* Exhibit 12 at p. 3-4.  Contrary to Hutchinson's Declaration, Forensic Examiner Rebecca Passmore would testify that at no point during the investigation did she believe that the devices belonged to anyone other than Individual-1.  She does not recall seeing any spreadsheets regarding campaign expenditures and would have pointed such a file out to agents if she would have seen it.  She does not recall seeing any information that would have been protected by the attorney-client privilege.  If she would have seen such information, she would have requested a taint review.  By October 17, 2012, the digital extractions of the electronic devices were staged by the CART team and available for review by the case agent assigned to the case, FBI Special Agent Mike Lowe.  *Id*. at 4. Agent Lowe did not review the contents at that time. After FBI CART obtained images of the devices, the devices were returned to Individual-1.

## C.    Hutchinson's Sworn Testimony Before the Ethics Commission

On November 5, 2012, the day after the media published a story regarding Hutchinson's misuse of campaign funds, the Arkansas Ethics Commission received a citizen complaint from Hutchinson against himself regarding two checks written on Hutchinson's campaign checking account in late 2010 during the 2010 election cycle.  Exhibit 13 at p. 1, 9-10, 17-22 (Ethics Commission Report).  Hutchinson's written statement acknowledged, "I did not keep proper records in 2010." *Id*. at p. 10.  During his sworn testimony on November 28, 2012, when asked whether his campaign kept records concerning the expenditures at issue, Hutchinson stated to the Ethics Commission Investigator:

> There were bank – I saw in the – the press showed me – or should I say, I went and pulled the checks from the bank, all my checks, and I found them, but I did not keep records.  I was going through a divorce at the time, a separation, and did not have access to my records, and then do not have them anymore, along with any of my

personal records, tax returns or – so we did keep records, but obviously not well enough. And I did not have access to them during this time or currently.

Exhibit 14 at p. 6-7 (Ethics Commission Testimony Transcript); Exhibit 14a (Audio of Hutchinson Ethics Commission Testimony).[4] At no time in his written statement or during his sworn testimony to the Ethics Commission did Hutchinson allege that he kept adequate records, kept a spreadsheet on a computer, or that his records were stolen. Rather, in November 2012, and while under oath, he indicated that he did not have access to his records at the time he filed the 2010 reports because he was going through a separation. *Id.* Hutchinson and his ex-wife separated in January 2011, and Hutchinson's divorce was final on June 2, 2011. *See* Exhibit 15 (Online record from 60DR-11-1676); Exhibit 16 (Testimony at p. 11, 16). It is anticipated that, if called to testify, Hutchinson's ex-wife would state that Hutchinson did not keep such campaign records and did not keep a ledger or spreadsheet on any device. *See* Exhibit 16 (Testimony at p. 30); Exhibit 16a (Text message dated 2/7/19).

### D.   FBI Opens an Investigation into Hutchinson's Conduct

Agent Lowe initiated the FBI investigation into Hutchinson on May 9, 2013, and the FBI formally opened the investigation on June 6, 2013. Email correspondence between Agent Lowe and Forensic Examiner Becky Passmore indicates that Agent Lowe made requests regarding the identification of information from the images of Individual-1's devices on June 14, 2013. *See* Exhibit 17 (Email dated 6-14-13). In mid-June 2013, the United States Attorney's Office for the Eastern District of Arkansas was consulted, and a case was opened on Hutchinson. *See* Exhibit 18 (Case Opening Sheet). In mid-2013, the FBI received independent information from a

---

[4] It appears that during the introduction, the speaker inadvertently stated the interview took place on November 28, 2011, rather than November 28, 2012.

Confidential Human Source corroborating information initially provided by Individual-1 regarding the unlawful expenditure of campaign funds by the Defendant.  *Id.*

On July 30, 2013, an analysis of campaign expenditures and contributions was completed. *See* Exhibit 19 (Report dated 7-30-13).  On December 10, 2013, FBI CART completed the report of examination regarding Individual-1's devices.  *See* Exhibit 12 at p. 1.  In late 2013 and 2014, the FBI received financial records regarding Hutchinson requested by the United States Attorney's Office for the Eastern District of Arkansas, including bank records and state tax records.  *See, e.g.,* Exhibits 20, 21, 22.

### E.      Hutchinson Provides a Voluntary Interview to the FBI

Close in time to the formal opening of the case with the FBI on June 6, 2013, Agent Lowe reviewed the contents of the images of the electronic devices. Prior to June 11, 2014, Agent Lowe asked Hutchinson if he would voluntarily meet at the Little Rock Field Office of the FBI. Hutchinson, who is an attorney and a former deputy prosecutor in the state of Arkansas,[5] agreed and was consensually interviewed on June 11, 2014 by Agent Lowe and by FBI TFO Will LeMaster.  Exhibit 25 (FBI 302, June 11, 2014).  In that interview, Hutchinson provided his biographical information and affirmed his understanding of campaign finance law.  *Id.* at 1. Hutchinson was asked to explain his cash withdrawals from his campaign account and was unable to do so.  *Id.*  Far from disclosing the existence of detailed ledgers, as claimed by Hutchinson today, he admitted during his 2014 interview that he did not keep proper records or receipts.  *Id.* Hutchinson blamed his poor record keeping on the fact that he was going through a divorce in 2011, but could not explain why he transferred money out of his campaign account into his

---

[5] Sen. Jeremy Hutchinson, Alex Gray Join Steel, Wright & Collier, *available at* https://amppob.com/sen-jeremy-hutchinson-alex-gray-join-steel-wright-collier/ (last reviewed March 3, 2019) (noting Hutchinson "served as a part-time deputy prosecutor in Saline County.").

personal account, and then spent the money on personal items. *Id*. at 1-2. He stated that he did

not have a defense to several transfers. *Id*. at 2. Hutchinson admitted that he allowed Individual-

1 to purchase a cruise from his campaign account, but later claimed he meant for Individual-1 to

use his personal money for the trip. *Id*. at 2. Hutchinson stated that he "screwed up" the campaign

reports and that "I've screwed up a bunch, I have exposure." *Id*. at 2. Of note, despite

Hutchinson's claim today that "it was obvious to [him] that some of the documents [Agent Lowe]

presented to [him] could only have been retrieved from the laptop" that Individual-1 purportedly

took from him, at no point did Hutchinson tell Agent Lowe or TFO LeMaster this in 2014, nor

does Hutchinson claim he did so in his Declaration. *See* Def. Exhibit 1 at ¶ 12.

Hutchinson went on to describe his professional biography, discussed some of his financial

dealings and explained some of his legislative activity and votes. Exhibit 25 at 3-5. It was not

until after hearing Hutchinson's statements regarding the bribery allegations that Agent Lowe

referenced a single email recovered from the imaged devices provided by Individual-1. *Id*. at 4;

Exhibit 25a. After being confronted with this email, Hutchinson admitted that: he was neither a

productive nor efficient attorney despite the $20,000 per month he was being paid, but that he

continued to be paid anyway; that this $20,000 per month was his sole source of income outside

the legislature; and that the appearance was bad. *See* Exhibit 25 at p. 4. He further admitted to

the agents that he failed to report this income on his taxes. *Id*. at 4-5.

Only after Hutchinson made these statements was the topic of him cooperating with the

FBI raised. This chronology of events is corroborated by the contemporaneous agent notes taken

during the June 11, 2014, interview. *See* Exhibit 26 (Notes of Interview 6-11-14). Toward the

end of the interview, Hutchinson offered to provide information to the FBI as a confidential source.

*Id*. at 8. Hutchinson provided limited information to the FBI at the end of his interview, including

information regarding a mental health provider client receiving General Improvement Funds and an extortion attempt. *Id*. at 7-9. However, at that time, Hutchinson did not provide information regarding the identities of the parties at issue. *Id*. at 7-9. Agent Lowe began drafting the FBI 302 report of the interview of Hutchinson two days after the interview, on June 13, 2014, as reflected in the bottom right portion of the report labeled "Date drafted." *See* Exhibit 25 at p. 1. The later date of "07/29/2014" on the top of the report reflects the date the report was approved by a supervisor and entered the FBI case file. *Id*.

During the meeting, Agent Lowe advised Hutchinson that he was not the IRS, but if he had tax issues, Hutchinson needed to take care of it. *See* Exhibit 27 (Agent Lowe 302). Agent Lowe advised Hutchinson that he may or may not be charged by the IRS or the United States Attorney's Office for tax violations. *Id*. Indeed, by Hutchinson's own admission, Agent Lowe explained that he did not have the authority to grant Hutchinson immunity. *See* Def. Exhibit 1 at ¶ 13. Agent Lowe also never implied that Hutchinson should not take care of his taxes. *See* Exhibit 27. During Agent Lowe's communications with Hutchinson, he advised the Defendant not to divulge privileged information. *Id*. Agent Lowe never ordered Hutchinson to disregard an attorney-client privilege. *Id*.

F.      **Hutchinson Becomes a Confidential Human Source**

Because the United States Attorney's Office for the Eastern District of Arkansas had Hutchinson's open case, Agent Lowe sought and received the concurrence of the office to open Hutchinson as a Confidential Human Source. Following his initial interview on June 11, 2014, Hutchinson had subsequent meetings with the FBI on July 1 and again on July 15, 2014. At the July 15, 2014, meeting, Hutchinson was provided with the FBI's standard admonishments for a confidential informant. *See* Exhibit 28 (CHS Admonishments). These were read in the presence

of another witness who verified that the admonishments were given.  According to the internal records of the FBI, on July 15, 2014, Hutchinson was admonished that "[t]he FBI on its own cannot promise or agree to any immunity from prosecution or other consideration by an [Federal Prosecutor's Office], a state or local prosecutor, or a court in exchange for the CHS's cooperation because the decision to confer any such benefit lies within the exclusive discretion of the prosecutor or court."  *Id*.  Hutchinson was also instructed that he was "not authorized to engage in any criminal activity and has no immunity from prosecution for any unauthorized criminal activity."  *Id*.  The admonishments were delivered by Agent Lowe and witnessed by TFO LeMaster.  *Id*.  Hutchinson was admonished more than once.  *Id*.

At the July 1, 2014, meeting, Hutchinson gave Agent Lowe more specific information regarding the alleged extortion attempt.  *See* Exhibit 29 (July 2014 CHS Report); Exhibit 29a (July 1, 2014 Notes).[6]  Agent Lowe discussed with Hutchinson bringing Rusty Cranford in to meet with the FBI to discuss the alleged extortion attempt.  At that time, Agent Lowe believed that Hutchinson only represented the mental health facility Dayspring, not Rusty Cranford personally. At no time during this meeting did Hutchinson indicate to the FBI that the information provided regarding Cranford and Woods was privileged, and Agent Lowe did not order Hutchinson to disregard a privilege.  *See* Exhibit 27 (Agent Lowe 302).  Even though Agent Lowe did not believe Hutchinson represented Cranford individually, it was determined by representatives of the United States Attorney's Office that because Hutchinson was acting as a Confidential Human Source, he should not participate in any interview of Cranford to avoid any later claim of a conflict.  In light of the conflict that would be present if Hutchinson participated in the interview, the FBI

---

[6] The Agent's handwritten notes reflect that this information was provided on July 1, 2014.  Thus, it appears that the "Date of Contact" on the typewritten report inadvertently stated "7/15/14."  Once Agent Lowe reviewed his handwritten notes, he realized this error.

approached Cranford to interview him on August 4, 2014, regarding the extortion threat. The interview was concluded when Cranford requested the presence of an attorney to provide additional details. Later, Hutchinson sent a text message to Agent Lowe stating, "I had it worked out that Rusty would come in without me. All was good and now this." *See* Exhibit 30 (Text messages between Agent Lowe and Hutchinson).[7]

From July 15, 2014 until August 2, 2016, Hutchinson operated as a Confidential Human Source for the FBI in an effort to receive consideration from the U.S. Attorney's Office regarding his criminal exposure.[8] The case against Hutchinson was initially declined by the United States Attorney's Office for the Eastern District of Arkansas in early 2015, and the matter was closed internally by the FBI in February of 2015. The reason cited in the closure of the investigation against Hutchinson, at that time, was insufficient evidence regarding bribery allegations and legislation.

At the time Agent Lowe closed the case in early 2015, FBI policy provided that "[w]hen an investigative case is closed, it is the responsibility of the" case agent "to dispose of" property or evidence when there is no further need for retention. As a result of the closure of the case against

---

[7] While not relevant to the instant Motion, the United States notes that the FBI, as early as March 2014, and well before the initial approach of Rusty Cranford by the FBI, had information pertaining to the investigation of Jon Woods and his relationship to General Improvement Funds. In any event, the United States' investigation has shown that Cranford disclosed the alleged extortion attempt to other individuals and that a third party was present both at the time of the alleged extortion attempt was made and when it was disclosed to Hutchinson; thus, despite Hutchinson's characterization of this event as potentially privileged material, Cranford's communication to Hutchinson regarding the alleged extortion attempt is not privileged. *See* Exhibit 31 (Cranford Interview February 20, 2019); Exhibit 31a at p. 2 (AO Board of Directors Meeting]; Exhibit 31b (Eddie Cooper Transcript Excerpt 1); Exhibit 31c (Eddie Cooper Transcript Excerpt 2); *see also United States v. Horvath,* 731 F.2d 557, 561 (8th Cir. 1984) ("The attorney-client privilege extends only to confidential communications made for the purpose of facilitating the rendition of legal services to the client .").

[8] Not once during the time period Hutchinson was operating as a source for the FBI did he report, either to the FBI or local authorities, the alleged theft of a laptop.

Hutchinson in early 2015, the images[9] obtained of the devices provided by Individual-1 were destroyed pursuant to FBI policy on or about December 14, 2015. *See* Exhibit 32 (Chain of Custody Images).[10] Records obtained by grand jury subpoena were also destroyed.

### G. Hutchinson's Newly Discovered Criminal Conduct and Reopening of His Case

In the Spring of 2016, an investigation into public corruption in the Western District of Arkansas revealed information that indicated that Hutchinson may have been continuing to engage in criminal conduct. Due to the information received in that investigation, the FBI closed Hutchinson as a source on August 2, 2016. In documentation accompanying his closing as a source, the FBI noted that Hutchinson "has questionable relationship[s] with current FBI subjects. CHS is being closed until it can be determined the extent of the relationships." *See* Exhibit 33 (CHS closing document).

On or about April 3, 2017, the investigation into Hutchinson on various potential criminal violations was re-opened by the FBI due to the receipt of new information. The United States Attorney's Office for the Eastern District of Arkansas opened this case. The Public Integrity Section of the Department of Justice, who was not a party to the original case closure, later joined this investigation. The recent FBI investigation into Hutchinson revealed evidence indicating Hutchinson was being untruthful to the FBI during the period of time that he was operating as a Confidential Human Source and continuing to engage in criminal activity. Notably, some of the alleged criminal conduct set forth in this Indictment occurred while Hutchinson was operating as a source.

---

[9] The original electronic devices turned over by Individual-1 on August 24, 2012 were returned to Individual-1 after they were imaged.

[10] On April 10, 2015, the FBI policy was revised. However, the destruction of the images of Individual-1's devices was nevertheless consistent with FBI policy.

During this investigation, other investigatory steps, completely independent from any information gleaned from these laptops, were utilized to determine the full nature of the Defendant's criminal conduct both prior to, and during, the period of his cooperation with the FBI. For example, bank records, tax records, and other financial records were subpoenaed. Also, multiple additional witnesses were interviewed regarding Hutchinson, and electronic evidence was obtained from a variety of sources.

### H.   Government's Good Faith Attempts to Obtain the Electronic Devices

After the reopening of the case against Hutchinson, and despite the United States' use of independent sources of information to investigate the matter, Individual-1 was nevertheless contacted by the FBI and asked to reproduce the computers she initially provided on August 24, 2012. On June 15, 2017, Individual-1 was able to produce an Apple PowerBook G4- Model #A1106 and consented to a search of the device, but to date, it has been unable to be imaged due to deterioration of the device in the interim. *See* Exhibit 34 (2017 Apple laptop and iPhone 7 Consent). On December 12, 2017, Individual-1 provided multiple cellular telephones and consented to the retrieval of any text messages and emails with Hutchinson, as well as all photos, images, and videos. *See* Exhibit 35 (Interview re: Individual-1 Devices); Exhibit 35a (12-12-17 consent to search). Information from those devices, including text messages between Individual-1 and Hutchinson, were provided in discovery. Individual-1 is no longer in possession of the Sony-Vaio at issue in this case.

Individual-1 also offered FBI Agents the opportunity to review her emails which provided voluminous historical communications between her and the Defendant. These were secured by federal search warrant and have been provided to Hutchinson. The search warrant executed in 2017 on Individual-1's email account revealed various communications, some of which are

referenced above, regarding Hutchinson providing computers and electronic devices to Individual-1. Additionally, contrary to Hutchinson's Declaration, contemporaneous email and text message communications between Individual-1 and Hutchinson, as well as bank records obtained during the investigation, showed that Hutchinson was providing financial support and gifts for Individual-1 long after the fall of 2012 and throughout their continued romantic relationship. Witness interviews, bank records and electronic communications show that Hutchinson and Individual-1 continued to have a financial relationship through at least early 2017 and that their personal relationship persisted long after Individual-1's deposit of the electronic evidence with the FBI on August 24, 2012. By way of example only, text messages on October 10 and 11, 2013, and photographs from October 11, 2013, reflect that Hutchinson took Individual-1 away for a baseball game. *See* Exhibit 23 (October 9-11, 2013 Text Messages). On December 19, 2014, Hutchinson and Individual-1 sent text messages arranging to meet. *See* Exhibit 24 (December 19, 2014 Text Messages). On April 11, 2015, a social media post shows Hutchinson and Individual-1 together. *See* Exhibit 16a (February 8, 2019 Text Message). *See also* Exhibit 4 at p. 38.

## I.   Hutchinson is Indicted Following the Reopening of his Case

On August 30, 2018, a grand jury in the Eastern District of Arkansas returned an Indictment charging Hutchinson with wire fraud and filing false tax returns. The Indictment alleges that Hutchinson stole, misappropriated, and converted for his personal use campaign contributions and donations not only by withdrawing nearly $78,000 in cash and cashing approximately $6,400 in campaign contribution checks, but also by debiting or spending approximately $41,000 directly from his campaign accounts, wiring or transferring by check or other means approximately $41,000 from his campaign accounts to his personal accounts, and depositing approximately

$42,000 in campaign contributions into his personal accounts.  Hutchinson concealed his theft and conversion by falsifying his campaign financial disclosure reports.

## II.    ARGUMENT

Hutchinson asks this Court to dismiss the Indictment pending against him alleging campaign fraud and tax violations on two bases:  (1) the allegedly unlawful search of a computer given to the FBI by his former girlfriend, Individual-1; and (2) the destruction of alleged *Brady* material held on the image of a laptop, which was provided by Individual-1, that was destroyed at the initial closure of the case against him in 2015.  In addition, Hutchinson also argues that his inculpatory statements to the FBI were involuntary and were the fruits of coercive investigatory tactics.  Finally, Hutchinson asks this Court to dismiss the Indictment based upon the cumulative effects of the alleged governmental misconduct.  In the alternative, Hutchinson asserts that the Court should suppress any evidence obtained as a result of the illegal search.

This Court should deny Hutchinson's motion.  As an initial matter, Hutchinson has failed to establish standing to challenge the search of the computer.  The Sony laptop was provided to the FBI by Individual-1 who asserted, and continues to assert, that the laptop belonged to her and Hutchinson has not shown otherwise, as is his burden. Moreover, even assuming, *arguendo*, that the Defendant at one time retained an expectation of privacy in the Sony laptop, by his own admissions, the Defendant abandoned his privacy interest in the device under the Fourth Amendment. Finally, even if this Court were to find that the Defendant somehow retained his expectation of privacy, the record clearly shows that Individual-1 had actual authority, and at a minimum, apparent authority, to consent to a search of the Sony laptop.  Thus, there was no illegal search and no Fourth Amendment violation.  Therefore, suppression is not warranted.

The Defendant has also failed to establish any Due Process violation. Specifically, there is no evidence beyond the Defendant's self-serving statements that establish the Sony laptop contained any exculpatory evidence. Even if true, the Defendant has also failed to establish that comparable evidence cannot be obtained by other reasonably available means. Furthermore, the FBI did not act in bad faith in destroying the images of the electronic devices, which were discarded pursuant to FBI policy when the case was closed. At the time of destruction, Agent Lowe did not know that Hutchinson continued to engage in criminal conduct.

Finally, the Defendant, who is an attorney and former prosecutor, voluntarily made inculpatory statements to the FBI in 2014. As there was no misconduct by the government, there is no cumulative effect justifying the dismissal of the Indictment.

A. **Hutchinson lacks standing to challenge the search of Individual-1's devices, and even if he ever had any interest in the devices, he has no legitimate <u>expectation of privacy in abandoned property.</u>**

As detailed below, this Court need not entertain a hearing on the Defendant's Motion because even if the Court were to credit the Defendant's claims that he owned the Sony laptop and that it was stolen by Individual-1 – claims the government submits are logically inconsistent and controverted by evidence in this case – by his own admission, the Defendant relinquished control of the laptop and thus, abandoned it for Fourth Amendment purposes. *United States v. Tugwell,* 125 F.3d 600, 602 (8th Cir. 1997). Accordingly, even if the Court were to take the Defendant at his word, he lacks standing to challenge the search. However, as an initial matter, the Defendant fails to meet even his initial burden establishing that he had an expectation of privacy in the laptop in question.

### 1. Hutchinson lacks standing to challenge the search of Individual-1's devices.

"The Supreme Court has enunciated a two part test to determine whether a person has a legitimate expectation of privacy in the place searched or the object seized. A court must determine: (1) whether the [defendant] has asserted a subjective expectation of privacy, and (2) whether the [defendant's] subjective expectation is objectively reasonable. *United States v. Stallings*, 28 F.3d 58, 60 (8th Cir. 1994) (citing cases). In order to challenge the consent search in this case, the Defendant bears the burden of first establishing that he has a legitimate expectation of privacy in the Sony computer that Individual-1 provided to the FBI. *United States v. Alberts*, 721 F.2d 636, 639 (8th Cir. 1983) ("In order for Alberts to raise the voluntary consent issue she must have maintained a legitimate expectation of privacy in the property that was searched."); *United States v. Morales*, 737 F.2d 761, 763 (8th Cir. 1984) ("[T]he defendant has the burden of establishing a legitimate expectation of privacy" in the searched premises.).  A defendant has no standing to challenge the search of a third party's computer.  *See United States v. Stringer*, 739 F.3d 391, 396 (8th Cir. 2014) (defendant had no standing to challenge search of third party's cell phone); *see also United States v. Milk*, No. CR 16-50118-JLV, 2018 WL 587863, at *4 (D.S.D. Jan. 29, 2018) ("Helping Ms. Poor Bear buy her phone and using it in the past are insufficient to demonstrate a legitimate expectation of privacy to the phone's contents. Those alleged facts fail to adequately show *ownership or possessory control* over the phone.") (emphasis added).

Here, Hutchinson has failed to meet his burden of establishing standing to challenge the search.  The Defendant offers only his self-serving statements that the Sony laptop was his. He offers no receipts or other documentary evidence that would corroborate his bare assertion that he was the owner of the Sony laptop at some point, nor does he provide any details as to where and under what circumstances he obtained either ownership or possessory control of the laptop. In

contrast, Individual-1 had possessory control of the laptop when she delivered it to the FBI and, most importantly, maintained control of the computer thereafter when it was returned with all the other devices. *See* Exhibit 4 at p. 33; Exhibit 4a. When confronted with the ultimate question that summarily undermines the Defendant's Motion – that is, *why* he *never* sought the return of the laptop, which according to him, contained vital records concerning his clients and campaign finances – the only credible excuse he offers this Court is that he did not want to endure the negative publicity. *See* Hutchinson Declaration at ¶ 6.[11]

As proof of his ownership of the Sony laptop, Defendant cites personal <u>emails</u> between the Defendant and his ex-wife shown to him by Agent Lowe that purportedly could "only have been retrieved" from the Sony laptop. *See* Hutchinson Declaration ¶ 12. However, the sole reference to any emails between Hutchinson and his ex-wife during the entirety of the Defendant's interview was not to any email retrieved from a computer, but rather to a <u>screenshot from a phone</u> recovered from a device belonging to Individual-1. *See* Exhibits 25, 25a (June 20, 2011 Email). Indeed, a review of electronic communications obtained from Individual-1's email account between Individual-1 and Hutchinson demonstrates that the Defendant routinely forwarded emails and screenshots of text messages between his ex-wife and himself to Individual-1.  *See, e.g.*, Exhibits 36, 36a, 36b, 36c.[12]

---

[11] The Defendant's other stated reason for failing to seek retrieval of the laptop – that he was in fear for his personal safety – is not credible. As Defendant notes, he previously called authorities to intervene between him and Individual-1 and offers no explanation why, in the two years between when Individual-1 allegedly stole his laptop and when he was interviewed by the FBI, he could not call the police and report his laptop stolen. Hutchinson Declaration ¶ 8. Even if the Court credits his specious claim that the Defendant failed to report the laptop stolen because he was in fear for his safety, at a minimum, he could have requested its return from the FBI, without engaging Individual-1, when, according to him, he states he allegedly realized the FBI was in possession of the laptop. *See* Hutchinson Declaration at ¶12.

[12] Defendant also cites to the fact Agent Lowe showed him bank records, tax records and campaign finance reports as proof that the laptop belonged to him. However, as explained *infra*, even if Agent Lowe showed the Defendant such documents, it is clear that such records were obtained by subpoena.

Defendant further asserts that, "as [he] recall[s], the home screen was password protected and displayed a name that indicated it belonged to [the Defendant]." Hutchinson Declaration at ¶ 21. First, Defendant once again offers no documentation in support of his claim, which is controverted by record evidence in this case. *See* Exhibit 7 (September 20, 2011 email showing that the Sony laptop was in fact registered to Individual-1). Moreover, additional evidence obtained in this case shows that even if the Defendant maintained a password-protected home screen on his computers, he gave a password to Individual-1 on at least one occasion so she could access a different laptop. Specifically, in late July 2010, documentary evidence shows Individual-1 asked Hutchinson for a laptop, and he indicated he would try to get her one.  *See* Exhibit 37 (7-28-10 email).  On September 2, 2010, Hutchinson forwarded Individual-1 an email regarding a laptop ready to be picked up by Hutchinson with an account called "Hutchinson," and provided the password to Individual-1.  *See* Exhibit 37a (9-2-10 email).  Emails show Individual-1 received an Apple laptop, referred to as the "old computer," by at least October 19, 2010.  *See* Exhibit 12 at p. 7; Exhibits 8, 9; *see also* Exhibits 10 and 11 (October 22, 2010 emails regarding passwords).  When Individual-1 provided the Apple and Sony laptops to the FBI in August 2012, she explained that one of the computers had more than one user account, including "hutchinson," as reflected in the handwritten CART notes.  *See* Exhibit 12. Despite the implication that Defendant used one or more of the laptops, the owner who maintained custody and primary control over the devices was Individual-1. Accordingly, Defendant has not met his burden in establishing any reasonable expectation of privacy in the Sony laptop.

## 2. A person does not have a legitimate expectation of privacy in abandoned property.

Even if one or more of the laptops did at one time belong to the Defendant, he relinquished any expectation of privacy in the devices when he abandoned them. If a defendant abandons

property, he no longer has a legitimate expectation of privacy and is precluded from challenging a search of the property. *See United States v. Caballero-Chavez*, 260 F.3d 863, 866 (8th Cir. 2001). Abandonment "is determined on the basis of the objective facts available to the investigating officers, not on the basis of the [defendants'] subjective intent." *Id*. at 867 (quoting *United States v. Tugwell,* 125 F.3d 600, 602 (8th Cir. 1997), *cert. denied,* 522 U.S. 1061, 118 S.Ct. 721, 139 L.Ed.2d 661 (1998)). "A warrantless search of abandoned property does not implicate the Fourth Amendment, for any expectation of privacy in the item searched is forfeited upon its abandonment." *Tugwell,* 125 F.3d 602.

Determining whether an item is abandoned is based upon the objective facts available to law enforcement, not on the subjective intent of the owner. *Tugwell*, 125 F.3d at 602 (citing *United States v. Rem*, 984 F.2d 806, 810 (7th Cir. 1993)). "This determination is to be made in light of the totality of the circumstances, and two important factors are denial of ownership and physical relinquishment of property." *Id*. (citing *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986)). The Court considers "only the information available to officers at the time of the search." *Id*. *See, e.g.*, *Tugwell*, 125 F.3d at 603 (holding defendant's actions were inconsistent with a continued expectation of privacy and upholding a finding of abandonment where defendant's refusal to claim a bag after three announcements was "tantamount to a denial of ownership" and he left the suitcase unguarded and unlocked in a public place); *United States v. Crumble*, 878 F.3d 656, 660 (8th Cir. 2018) (holding Crumble abandoned vehicle and its contents, including the cell phone, where he crashed, fled the scene, the key was in the vehicle and its back window was shot out, even though he claimed he fled from the shooter in the other vehicle, not the police) (citing *United States v. Taylor*, 462 F.3d 1023, 1025-26 (8th Cir. 2006) (finding defendant abandoned cell phone when he dropped it on street while fleeing vehicle); *United States v. Smith*, 648 F.3d 654,

660 (8th Cir. 2011) (finding defendant abandoned vehicle and contents when he fled, leaving door open, key in ignition, and motor running); *United States v. Tate*, 821 F.2d 1328, 1330 (8th Cir. 1987) (same).

The Defendant does not dispute that in the nearly two years that passed between when the Defendant alleges Individual-1 stole the laptop in question and when he was first interviewed by the FBI – a time in which he had multiple contacts with law enforcement agents – he not once reported the alleged theft of the laptop by Individual-1 nor independently attempted to retrieve the laptop. Indeed, it was not until even years after he was first interviewed by the FBI and when it was clear he may be charged with the instant offenses that he alleged the theft of the computer. Under the undisputed facts, and as admitted to by the Defendant, he physically relinquished the Sony laptop and thus abandoned any expectation of privacy to the computer. *Rem*, 984 F.2d at 810.

Moreover, Defendant's argument that the FBI should have inferred that the devices delivered to them by Individual-1 belonged to the Defendant because there was (1) "animosity" between the Defendant and Individual-1 and (2) a news article, which he contends should have been read by the FBI agents, detailed an alleged domestic assault by Individual-1 on the Defendant, lacks merit. *See* Motion at 12. Such a finding would essentially impute knowledge of all media articles onto the government consciousness and require law enforcement agents to confirm whether any romantic partner is asserting a privacy interest in a device delivered to the FBI by their partner in circumstances where there is apparent "animosity."

In contrast, the FBI agents, when viewing "the information available to the officers at the time of the search," acted reasonably. *See Tugwell*, 125 F.3d at 603. Individual-1: (1) had physical possession of the Sony laptop when she delivered it to the FBI; (2) represented that the laptop and

other devices belonged to her; and (3) provided details about the devices including password information and content that would be contained within the devices. Even assuming, *arguendo*, that the agents should have somehow concluded that the laptop did not belong to Individual-1 prior to searching it, the agents would have been reasonable in concluding that the Defendant abandoned the laptop when the Defendant chose to not report it stolen. *United States v. Landry*, 154 F.3d 897, 899 (8th Cir. 1998) (the objective facts available to the officers supported a finding that the defendant abandoned the property, and the defendant's personal intent is irrelevant).

### 3.   The Defendant's Claims are Not Credible

Because standing is a threshold question, and because the entirety of the Defendant's argument for standing is built on the credibility of his allegations that he: (1) owned the Sony laptop; (2) that Individual-1 stole the computer; and (3) that the FBI should have known of these claims, the government asks the Court to weigh the Defendant's allegations, and his credibility, within the context of the entire record now before the Court in his Motion and this Response.

First, Hutchinson, an educated man, an elected official, and an attorney with an ethical duty to safeguard client communications (that he now maintains were on a laptop turned over to the FBI) did not report a theft at the time it allegedly occurred in late July or early August 2012. If Hutchinson's Declaration is to be believed, he was "quite confident that the texts [on Individual-1's phone turned over to the FBI] would have shown her telling me that she took my computer to the FBI." *See* Def. Exhibit 1. This means that Hutchinson is "quite confident" that he was being told, in real time, that Individual-1 was turning over the computers to the FBI. Hutchinson could have reported the theft at least on August 24, 2012, the day that Individual-1 turned the devices over to the FBI, or at any point over the years after the alleged "theft."

Second, Hutchinson, a practicing attorney, not only has a brother who is an FBI agent but also states that he "was friends" with another FBI Agent.  Hutchinson's alleged fear of a "potentially dangerous situation" and Individual-1's alleged "violent behavior" would no longer be at issue if Hutchinson retrieved the devices directly from the FBI.  Even if he was "not certain" of what happened to the laptop, Hutchinson was in a position to make a report of the stolen property to either state or federal officials and request the return of this property without having to engage Individual-1.

Third, Hutchinson next had the opportunity to report the computer stolen when he encountered the Little Rock Police Department during a domestic dispute with Individual-1 on September 4, 2012.  *See* Defendant's Exhibit 6.  In his Declaration, Hutchinson states that it was his fear of Individual-1's "volatile nature" putting him in a "dangerous situation" if he ever tried to confront her over this laptop.  It strains credulity to believe that on September 4, 2012, Hutchinson had enough courage to make a battery claim against Individual-1 but still feared for his safety enough to fail to report the laptop stolen.

Fourth, less than one month later, on October 1, 2012, Hutchinson requested the assistance of law enforcement again when he detailed extensive property damage allegedly perpetrated by Individual-1, complained of harassing text messages and bemoaned personal pictures being posted on social media sites.  In these varied complaints regarding Individual-1, Hutchinson again declines to mention the laptop.

Fifth, less than two years after the alleged "theft," Hutchinson had another opportunity to advance these claims at the time of his interview with Agent Lowe on June 11, 2014. Hutchinson now states that "it was obvious to me that some of the documents [Agent Lowe] presented to me could only have been retrieved from the laptop [Individual-1] previously had taken from me."

23

Despite how "obvious" it was, Hutchinson declined to mention to Agent Lowe that any of these documents might have been stolen from him, may have been covered by a privilege, and were obtained in violation of his rights. Instead, Hutchinson proceeded to give the Agent inculpatory statements regarding his campaign and tax violations and offered to provide information to the FBI in an attempt to avoid prosecution.

Sixth, any attorney who had a reasonable expectation of privacy in a computer that contained professional and personal files would have reported the theft to local law enforcement, at a minimum. If the computer actually had any client-related documents or privileged communications, presumably, an attorney would consider it a professional obligation to attempt to regain access to the computer.

Finally, the United States notes that Hutchinson's Declaration indicates that he "ended the relationship" with Individual-1 in the summer of 2012, yet he fails to disclose to this Court information material to the Court's assessment, namely that he subsequently had extensive contact with Individual-1. As discussed above, Individual-1 and Hutchinson continued an intimate relationship in the years after the alleged theft. The United States has provided only a small sample of such electronic evidence herein. The testimony and sample communications and photographs submitted by the United States further contradict Hutchinson's claim that he "never tried to retrieve his laptop from [Individual-1] because [he] did not want to place [himself] in danger." *See* Exhibits 4, 16a, 23, 24. If there is any question about this, the United States can provide additional exhibits for the Court's consideration.

### 4. Hearing

The Court's Pretrial Order for Criminal Cases provides that the "Court will deny an evidentiary hearing on suppression motions that are supported only by general or conclusory

assertions founded on mere suspicion or conjecture."  "A district court must hold an evidentiary hearing only when the moving papers are sufficiently definite, specific, and detailed to establish a contested issue of fact."  *United States v. Stevenson*, 727 F.3d 826, 830 (8th Cir. 2013) (citing *United States v. Mims,* 812 F.2d 1068, 1073–74 (8th Cir. 1987) ("A hearing is also unnecessary if it can be determined that suppression is improper as a matter of law.").  "Where a defendant offers only conclusory allegations in support of a motion to suppress, and where those allegations are unsupported by any citation to the record, a district court does not abuse its discretion by refusing to hold an evidentiary hearing."  *Id*. at 831 (citing *United States v. Allen,* 573 F.3d 42, 52 (1st Cir. 2009); *United States v. Mims,* 812 F.2d 0168, 1073–74 (8th Cir. 1987)).  As the foregoing illustrates, the Defendant cannot overcome the initial hurdle regarding standing to bring a suppression motion.  The evidence discussed herein indicates that Hutchinson's claim that the Sony laptop belonged to him is conjecture and unsupported by facts. Moreover, even if the Court credits the Defendant's initial claim of ownership, the government submits that he admits to its abandonment.  If the Court determines that a hearing is necessary, the United States respectfully requests that the Court address the standing issue at the outset.

**B.**    **There is no Fourth Amendment violation because Individual-1 had actual authority to consent to a search of the electronic devices she brought to the <u>FBI, and at a minimum, there was apparent authority to consent to a search.</u>**

**1.**    **Actual Consent Authority**

Generally, the Fourth Amendment requires that a warrant be issued by a neutral magistrate before an item can be search or seized.  However, "[w]here a person having authority over the premises voluntarily consents to a search, [] law enforcement may conduct a warrantless search without running afoul of the Fourth Amendment."  *United States v. Williams*, 346 F.3d 796, 799 (8th Cir. 2003) (citing *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242

(1974); *Schneckloth v. Bustamante*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). "[C]onsent reasonably implied from behavior suffices to trigger the exception." *Id.* "[T]he government must prove by a preponderance of the evidence" that Individual-1 "gave voluntary consent under the totality of the circumstances." *Id.*[13]

Consent may be given by the suspect "or by some other person who has common authority over, or sufficient relationship to, the item to be searched." *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003) (citing *Matlock*, 415 U.S. at 171). "Common authority is a function of mutual use, joint access, and control[.]" *Id.* (citing *United States v. Bradley*, 869 F.2d 417, 419 (8th Cir. 1989)). Whether a person has actual authority to consent is a question of fact. *Id.* Individual-1 had actual authority to consent to the search of the electronic devices belonging to her and in her possession. Thus, there is no Fourth Amendment violation.

Here, the record supports the finding that Individual-1 had actual or common authority to consent to a search of the devices, including the Sony laptop. She not only actually possessed the items and represented to the FBI that the devices were lawfully in her possession and control, but she also provided the FBI with several passwords to access the computers and its contents. The forensic analyst contemporaneously documented the passwords offered by Individual-1. *See* Government's Exhibit 12 at 7. Additionally, Individual-1 offered information on what types of information would be found on the devices. *Id.*

---

[13] *See also Fernandez v. California*, 134 S.Ct. 1126, 1132, 188 L.Ed.2d 25 (2014) ("Consent searches are part of the standard investigatory techniques of law enforcement agencies" and are "a constitutionally permissible and wholly legitimate aspect of effective police activity.") (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 231-32, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). "It would be unreasonable—indeed, absurd—to require police officers to obtain a warrant when the sole owner" of a premises voluntarily consents to search. *Id. See also United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006) ("Officers may search an area or an object if they obtain voluntary consent from someone possessing authority over that area or object.") (citing *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990)).

In providing the computers and passwords to the FBI, Individual-1 was unequivocal—the computers were hers.  The fact that she had passwords to those computers and was using them as her own provided evidence that she enjoyed complete authority over the computers, and at the very least, common authority.  Passwords serve the same function as keys to physical property.  By possessing the passwords to the computer, Individual-1 was providing access to a space in which she maintained a privacy interest.  *See United States v. Hinkle*, 456 F.3d 836, 840 (8th Cir. 2006) (holding a third party property owner on which the trailer was located, with joint access to the trailer as demonstrated by defendant giving her the keys, had actual and apparent authority to consent to a search of the trailer); *United States v. Elam*, 441 F.3d 601 (8th Cir. 2006) (holding that law enforcement reasonably believed that a person had the authority to consent to a search where the locked cabinet was in a common closet and the person retrieved a key from a common key rack and handed it to law enforcement while defendant remained silent) (citing *United States v. Stapleton*, 10 F.3d 582 (8th Cir. 1993) (holding "officers were reasonable in thinking the driver could consent to the search because the passenger 'remained silent when told of the search and the object of the search, and he did not indicate that the telephone was his property and the patrolmen did not have his permission to search it.'").  At the time of the search, there was no indication that these devices belonged to anyone else other than Individual-1.

### 2.  Apparent Authority

"Even when a third party lacks actual authority to consent to search or seizure of shared property or premises, the Fourth Amendment is not violated if the officers reasonably relied on the third party's apparent authority to consent, *United States v. James,* 353 F.3d 606, 615 (8th Cir. 2003), because the Amendment's reasonableness requirement demands of government agents 'not that they always be correct, but that they always be reasonable.'"  *United States v. Clutter*, 674

F.3d 980, 983 (8th Cir. 2012) (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 185, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)).  "Apparent authority exists when 'the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'"  *Id.* (quoting *United States v. Amratiel,* 622 F.3d 914, 916 (8th Cir. 2010) (omission in original); *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)).  While "[s]ome circuits have ... require[d] police to go behind appearances to verify third party authority[,]" the Eighth Circuit "has been more liberal about allowing police to form their impressions from context." *Id.* (citing *United States v. Almeida–Perez,* 549 F.3d 1162, 1171 (8th Cir. 2008) (consent valid where man on the front porch led officers "into the house without knocking'); *United States v. Cos,* 498 F.3d 1115, 1128–31 (10th Cir. 2007); *United States v. Whitfield,* 939 F.2d 1071, 1074–75 (D.C. Cir. 1991)).  *See also Iron Wing v. United States,* 34 F.3d 662, 665 (8th Cir. 1994) (holding that a woman showed familiarity with a house by climbing in through an unlocked window); *United States v. Lindsey*, 702 F.3d 1092, 1096 (8th Cir. 2013) (upholding woman's consent to search where she "answered the door and showed familiarity with the house by responding 'no' when asked if the suspect was there") (citing cases).

Here, the facts available to law enforcement at the time Individual-1 provided the consent to search, her representation of ownership, possession of the items, passwords, and description of the contents, would lead a person of reasonable caution to believe that she had authority over the electronic devices. Hutchinson's claims that he was the victim of a theft by a former girlfriend are similarly unavailing because the crucial issue for a Fourth Amendment analysis of the United States' actions is one of reasonableness.  Even assuming *arguendo* that the electronic devices were stolen from Hutchinson and turned over to law enforcement on August 24, 2012, which the United

States disputes in light of the evidence, that allegation could not have been known to the FBI at the time of search.

### C.     The agents acted in good faith.

"[T]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands." *United States v. Hamilton*, 591 F.3d 1017, 1027–28 (8th Cir. 2010) (quoting *Arizona v. Evans,* 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995)). The Eighth Circuit has repeatedly held that "[t]he exclusionary rule's 'sole purpose . . . is to deter future Fourth Amendment violations.'" *United States v. Tuton*, 893 F.3d 562, 569 (8th Cir. 2018) (quoting *Davis v. United States*, 564 U.S. 229, 236–37, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011)). "[W]hen the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" *Id*. at 579 (quoting *Davis,* 564 U.S. at 238) (citations and quotations omitted).[14]

The exclusionary rule generates "substantial social costs," and the Supreme Court has been "cautio[us] against expanding" it. *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S.Ct. 2159, 2163 (2006) (quoting *Leon*, 468 U.S. at 907; *Colorado v. Connelly*, 479 U.S. 157, 166, 107 S.Ct 515, 93 L.Ed.2d 473 (1986)).  The Supreme Court has "repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application" *Id*. (quoting *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357,

---

[14] *See also Hamilton*, 591 F.3d at 1027-28 ("Indeed, exclusion has always been our last resort, not our first impulse, and [Supreme Court] precedents establish important principles that constrain application of the exclusionary rule.") (quoting *Herring v. United States*, 555 U.S. 135, 129 S.Ct. 695, 700, 172 L.Ed.2d 496 (2009); *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)).  "As a judicially-created remedy, the exclusionary rule applies only where 'its remedial objectives are thought most efficaciously served.'" *Id*. at 1028 (quoting *Arizona v. Evans*, 514 U.S. at 11, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995)).  "The exclusionary rule is not an individual right, but it 'applies only where it 'results in *appreciable deterrence.*'" *Id*. (quoting *Herring*, 129 S.Ct. at 700; *United States v. Leon*, 468 U.S. 897, 909, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).

364-365, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)). It is applicable only "where its deterrence benefits outweigh its 'substantial social costs.'" *Id.* (quoting *Scott*, 524 U.S. at 363, 118 S.Ct. 2014; *Leon*, *supra*, at 907). "[E]xclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." *Id*.

Here, the law enforcement officers involved had no reason to believe that Individual-1 did not have authority to consent to a search of the devices, and there was no Fourth Amendment violation. They acted in good faith. Even if the Court finds a Fourth Amendment violation, application of the exclusionary rule would not result in appreciable deterrence. Therefore, the motion should be denied.

### D.     Fruit of the Poisonous Tree

Hutchinson claims that the information received from Individual-1's devices was obtained in violation of the Fourth Amendment and that the information tainted the investigation. He suggests that the search of Individual-1's computer tainted the entirety of his June 11, 2014 interview and that the bank records were obtained as a direct result of the search. Hutchinson asserts that the Court should allow an evidentiary hearing to determine the full universe of evidence derived from the search of the laptop, and any such evidence should be suppressed.

As set forth above, there was no Fourth Amendment violation, and therefore, the Court need not address this issue. However, even if there was a Fourth Amendment violation, there are multiple exceptions to the exclusionary rule. *See United States v. Reinholz*, 245 F.3d 765, 779 (8th Cir. 2001) (discussing the independent source doctrine, the attenuated connection doctrine, and the inevitable discovery doctrine). The information garnered in the investigation was independent of and sufficiently attenuated from any alleged constitutional violation, and inevitably would have

been discovered by lawful means without any reference to the materials recovered from the devices.

### 1. Independent Source Doctrine

The independent source doctrine provides that evidence initially discovered during an unlawful search, but later obtained independently through activities untainted by the illegality, may be admitted into evidence. *United States v. Khabeer*, 410 F.3d 477, 483 (8th Cir. 2005) (citing *Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)). "This rule is rooted in the view that 'the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.'" *Id.* (quoting *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). "Under the independent source doctrine, the exclusionary rule is inapplicable where the evidence was acquired through a source independent of the tainted search." *United States v. Rodriguez*, 834 F.3d 937, 942 (8th Cir. 2016) (quoting *United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013)). *See also United States v. Lewis*, 738 F.2d 916, 921 (8th Cir. 1984) ("Evidence from an independent source will not be excluded . . . if the government shows by a preponderance of the evidence that it is untainted.").

The Defendant has the burden of establishing a factual nexus between an alleged Fourth Amendment violation and the challenged evidence. *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007). "'[B]ut-for causality is only a necessary, not a sufficient, condition for suppression." *Id.* (quoting *Hudson,* 126 S.Ct. at 2164). As a threshold matter, he has failed to establish a factual nexus.

Individual-1 provided an initial verbal report of criminal conduct to the authorities on August 20, 2012.  In that complaint she provided detailed information regarding Hutchinson's misuse of his campaign funds and gave specific examples of him using his campaign accounts for personal use.  She then turned over the computers on August 24, 2012.  The investigation into Hutchinson was opened upon the complaint of Individual-1 and subpoenas were issued for Hutchinson's financial accounts.  Agent Lowe did not review the contents of the staged devices until sometime after the case was opened by the FBI in June 2013.  *See* Exhibit 17 (Email dated 6-14-13).

Moreover, the acquisition of Hutchinson's bank account records by subpoena is clearly an independent source.  The FBI obtained the records in light of the statement made by Individual-1 and a separate Confidential Human Source.  *See* Exhibit 18.  The decision to obtain the financial records was independent of any search of Individual-1's electronic devices.  In *United States v. Hawley*, 855 F.2d 595, 603 (8th Cir. 1988), the Eighth Circuit held that even if copies of bank records were seized during an allegedly illegal search, the documents were properly admitted at trial "because the government could have obtained identical evidence from the banks without any search" of the defendant's home.

As to Hutchinson's statement to the FBI on June 11, 2014, it is important to note that he made several independent admissions *prior* to being made aware of any of the contents of the devices.  These admissions against his interest would not be fruit of any alleged constitutional violation, but instead would be independent evidence probative of the issues contained in the pending Indictment against him.  Amongst those admissions: the Defendant affirmed his understanding of campaign finance law; could not explain his cash withdrawals and transfers from his campaign account; acknowledged his failure to keep proper records or receipts; admitted

allowing Individual-1, whom he was living with at the time, to purchase a cruise using campaign money; and admitted that he had "exposure" on campaign issues.  *See* Exhibit 25.  Hutchinson cannot establish that the use of this email, which was not derived from his laptop, during the interview has a sufficient nexus to his admissions concerning the matters of the present Indictment.

### 2.    Attenuation Doctrine

Here, even if this Court were to find that the search of the devices was conducted in violation of the Fourth Amendment, the evidence against Hutchinson in this matter is attenuated from any taint derived from the search of those devices.  The attenuation doctrine is an established exception to the exclusionary rule."  *United States v. Watson*, 950 F.2d 505, 507 (8th Cir. 1991). The Eighth Circuit has held that some intervening voluntary acts on the part of a defendant may be sufficient to purge the taint of an illegality.  *Id.* (citing *United States v. Dickson*, 64 F.3d 409, 410-11 (8th Cir. 1995); *United States v. Ramos*, 42 F.3d 1160, 1163-64 (8th Cir. 1994)).

In *Wong Sun v. United States*, 371 U.S. 471, 491, 83 S.Ct. 407 (1963), the Supreme Court found that although defendant's Fourth Amendment rights had been violated by an arrest without probable cause, defendant's latter statement was admissible because "the connection between the arrest and the statement had become so attenuated as to dissipate the taint."  There, the defendant "had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement." *Id.*   "When determining if sufficient attenuation exists, [the court] must focus on three specific factors:  (1) the time elapsed between the illegality and acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct."  *United States v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006).

Here, the devices were acquired August 24, 2012, and imaged shortly thereafter.   The interview of Hutchinson occurred on June 11, 2014.   Thus, the time elapsed between the alleged illegality and acquisition of the information from the interview is significant.   As to intervening circumstances, between the initial acquisition and imaging of the devices, the FBI obtained and analyzed independently obtained financial and campaign records prior to the interview of Hutchinson. *See United States v. Smith*, 715 F.3d 1110, 1116 (8th Cir. 2013).

As to the third factor, law enforcement clearly did not act in bad faith.   *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1113 n.5 (8th Cir. 2007) (noting that the Eighth Circuit has found consent sufficient to purge a taint even in the absence of intervening circumstances where the circumstances suggest that the officer was not trying to exploit an illegal situation and his conduct was in good faith) (citing cases).   "The purpose and flagrancy of official misconduct is considered the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct." *Simpson*, 439 F.3d at 496.

The statement in this case was given almost two years after Individual-1 provided the FBI with the electronic devices and consented to their search.   Investigators met with Hutchinson on June 11, 2014, after he agreed, voluntarily, to come to the FBI.   Toward the end of the interview, Hutchinson expressed his desire to cooperate in the investigation.   There is no evidence of bad faith by law enforcement.   Furthermore, the investigators committed no misconduct, and under these facts, no reasonable officer would believe that his conduct was unconstitutional.   Even if the FBI was mistaken in its belief that Indivdiual-1 had authority to consent to a search, such an unintentional error is a "far cry from [] purposeful and flagrant misconduct that weighed in favor of suppression" in other cases. *United States v. Yorgensen*, 845 F.3d 908, 916 (8th Cir. 2017).

### 3.    Inevitable Discovery Doctrine

"[C]hallenged evidence will be admissible under the 'inevitable (or ultimate) discovery' doctrine if the prosecution can establish that it inevitably would have been discovered by lawful means without reference to the police misconduct."  *United States v. Dickson*, 64 F.3d 409, 410 (8th Cir. 1995) (quoting *Hamilton v. Nix,* 809 F.2d 463, 465–66 (8th Cir.1987) (*en banc* ), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987)).  Although Hutchinson cannot establish that any of the evidence obtained was discovered due to any misconduct, even if he could establish a nexus, the United States has received extensive evidence through other means, including subpoenas, witness interviews, and voluntary productions, that the government would have otherwise obtained following the initial report by Individual-1, regardless of the data copied from the laptop. Therefore, suppression is inappropriate.

**E.    Hutchinson cannot establish a Due Process violation because he has failed to demonstrate that the images of Individual-1's devices possessed an exculpatory value apparent before the evidence was destroyed, comparable evidence is available by other reasonably available means, and the United <u>States did not destroy the images of Individual-1's devices in bad faith.</u>**

Hutchinson seeks dismissal of the Indictment asserting that the government intentionally and in bad faith destroyed exculpatory and potentially useful evidence.  Hutchinson claims that the evidence lost was essential to the defense, unique, and cannot be recreated or obtained elsewhere.  Hutchinson's claims are without merit.

"[T]he Supreme Court has developed a framework to analyze 'what might loosely be called the area of constitutionally guaranteed access to evidence.'"  *United States v. Femia*, 9 F.3d 990, 993 (1st Cir. 1993) (citing *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984); *Arizona v. Youngblood,* 488 U.S. 51, 55, 109 S.Ct. 333, 336, 102 L.Ed.2d 281 (1988) (each quoting *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440,

3446, 73 L.Ed.2d 1193 (1982)).  "The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes." *Id.*  "*Brady* and its progeny address exculpatory evidence still in the government's possession." *Id. Youngblood* and *Trombetta* govern cases in which the government no longer possesses the disputed evidence. *Id.*

"*Trombetta* and *Youngblood* together established a tripartite test to determine whether a defendant's due process rights have been infringed by law enforcement's failure to preserve evidence." *Id*.  In *Trombetta*, the Supreme Court determined that in order to show a constitutional violation for missing evidence, a defendant must overcome two hurdles: (1) the "evidence must possess an exculpatory value that was apparent before the evidence was destroyed," and (2) the evidence must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. (quoting *Trombetta*, 467 U.S. at 488-89. *See also United States v. Webster*, 625 F.3d 439, 446 (8th Cir. 2010) ("[T]he evidence must have had apparent exculpatory value and comparable exculpatory evidence must not have been reasonably available to the defendant.").  "The mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994).

"In *Youngblood,* the Court later added a third element when it held that 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of the law.'" *Femia*, 9 F.3d at 993 (quoting *Youngblood*, 488 U.S. at 58); *see also United States v. Houston*, 548 F.3d 1151, 1155 (8th Cir. 2008) ("If [] the evidence in question is only potentially useful, as opposed to clearly exculpatory, then a criminal defendant must prove bad faith on the part of the police to make out a due process

violation.").[15]  The Eighth Circuit has "stressed that the burden of demonstrating bad faith on the part of the government resides with the defendant." *United States v. Webster*, 625 F.3d 439, 447 (8th Cir. 2010).

The United States maintains that the computers belonged to Individual-1. Moreover, there is no evidence that a spreadsheet of cash expenditures on the Sony laptop existed, in addition to the other evidence the Defendant alleges was destroyed.  Even if it did exist, the import of the alleged spreadsheet is unknown and disputed and thus, would only potentially be useful, and Hutchinson cannot establish bad faith because the United States did not act in bad faith.

> 1.      **Hutchinson has failed to establish that Individual-1's devices possessed an exculpatory value that was apparent before the evidence was destroyed.**

As set forth above, because the evidence demonstrates that Individual-1 possessed and used the laptops, rather than Hutchinson, there is no evidence to support Defendant's claims that the Sony laptop contained Microsoft Excel spreadsheets detailing campaign contributions and cash expenditures for the his political campaigns. He also asserts that he had emails about his alimony and child support payments on the computer, as well as records for his clients. *See* Def. Ex. 1[16] Defendant's claims are without merit.

> a.      *Campaign Spreadsheet Records*

Hutchinson's sworn statement to the Ethics Commission in November 2012, is inconsistent with his current claims.  Hutchinson admitted then that he "did not keep proper records in 2010."

---

[15] *See also United States v. LeBeau*, 867 F.3d 960, 976–77 (8th Cir. 2017) ("Law enforcement's failure to preserve potentially exculpatory evidence violates due process if the defendant can show that law enforcement acted in bad faith[.]"); *United States v. Williams*, 577 F.3d 878, 882 (8th Cir. 2009) ("[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law") (quoting *Youngblood*, 488 U.S. at 58); *United States v. Scoggins*, 992 F.2d 164, 167 (8th Cir. 1993) (same).

[16] While Defendant lists such emails as potentially exculpatory evidence in his Motion, he fails to articulate how such evidence would be exculpatory in relation to the Indictment, which charges him with campaign finance and tax violations.

Exhibit 13 at p. 10.  Under oath, Hutchinson stated that he "did not keep records" or at least "not well enough."  Exhibit 14 at p. 6-7 (Ethics Commission Testimony Transcript); Exhibit 14a (Audio of Hutchinson Ethics Commission Testimony).  Again, at no time in his written statement or during his sworn testimony did Hutchinson allege that he kept adequate records, kept a spreadsheet on a computer, or discuss that his records were stolen.  Rather, in November 2012, he indicated that he did not have access to his records at the time he filed the 2010 reports because he was going through a separation.  *Id*.  Hutchinson and his ex-wife separated in January 2011, and Hutchinson's divorce was final on June 2, 2011.  *See* Exhibit 15; Exhibit 16 at p. 11, 16.  It is anticipated that Hutchinson's ex-wife, if called to testify, would affirm his Ethics Commission testimony that Hutchinson did not keep such campaign records and further that he did not keep a ledger or spreadsheet on any device.  *See* Exhibit 16 (Testimony at p. 30); Exhibit 16a (Text message dated 2/7/19).

Moreover, if Hutchinson kept campaign records on Individual-1's laptop, he could have accessed them once he realized the FBI had retrieved images from the laptop used during his interview and again after the FBI returned the laptop to Individual-1.  As discussed above, Hutchinson and Individual-1 had contact in late 2013, 2014, and 2015.  If he ever maintained exculpatory campaign records on these devices, surely Hutchinson would have attempted to obtain those records in light of his legal obligations to maintain campaign records, and especially upon learning that the FBI had an investigation open regarding his illegal campaign expenditures in 2014.  Instead, in 2014, when pressed upon his numerous cash withdrawals, Hutchinson admitted to Agent Lowe that he did not keep proper records or receipts and defended his spending of campaign money on personal items by saying "everyone was doing it."  *See* Exhibit 25.

Furthermore, if the Sony laptop held the spreadsheets in question, they would have been of obvious evidentiary value to Agent Lowe and the forensic examiner. It is anticipated that Agent Lowe would testify that he did not see any documents or spreadsheets meeting these descriptions when he reviewed the images of the devices.  Similarly, the forensic examiner has no recollection of any such documents. Agent Lowe reviewed the images of Individual-1's devices and was able to find only a few items that were of apparent relevance to the investigation, which have been provided in discovery.  Those documents do not establish that the devices belonged to Hutchinson, nor are they exculpatory. If Hutchinson's Declaration were true, Hutchinson would have referred the Agent to the laptop and the records contained therein during his June 11, 2014 interview rather than admitting to his tax and campaign violations.

### b.      Individual-1's Text Messages

Hutchinson also claims that Individual-1's iPhone would have contained text message conversations that could be used to impeach Individual-1.  Hutchinson states he remembers that there would have been texts about her breaking into his condo and stealing his things, including the computer. Def. Ex. 1.  He is "quite confident" the texts would have shown her telling him that she took his computer to the FBI. *Id*. at ¶ 28.  Once again Defendant offers only conjecture and his self-serving statements in support of his argument. Moreover, as set forth above, the totality of evidence in this case does not support the assertion that Individual-1 stole a laptop. Accordingly, the Defendant fails to establish that Individual-1's devices contained exculpatory information that would have been apparent prior to the destruction of the images.

2.    **Hutchinson has also failed to establish that the evidence was of such a nature that he would be unable to obtain comparable evidence by other reasonably available means.**

Since the re-opening of the investigation into Hutchinson, the United States has not only re-subpoenaed banking information, filings with the Arkansas Secretary of State's office and tax documents, but additionally interviewed witnesses and received substantial amounts of electronic evidence as it relates to Individual-1, who is only a potential trial witness at this point. Accordingly, the Defendant has failed to establish that he is unable to obtain records referenced in his Motion from reasonably available means.

a.    *Campaign Spreadsheet Records*

Hutchinson knew he had an affirmative duty to keep receipts and documents showing his expenditures for a period of four (4) years under the applicable rules and regulations imposed by Arkansas state campaign finance law and the Arkansas Ethics Commission. *See* Exhibit 14 at p. 5. The use of spreadsheets to "document" items is not a substitute for the receipts and documentation itself. Hutchinson had and continues to have access to bank records, physical receipts, the testimony of witnesses, and his filed campaign finance reports that would enable to him to re-create the records he now claims were lost. Indeed, pursuant to the Arkansas Code, state senate candidates, like the Defendant, are required to file monthly campaign contribution and expenditure reports ("Reports") with the Arkansas Secretary of State's office in Little Rock. Ark. Code § 7-6-207(B)–(C). In those Reports, candidates must, *inter alia*, (1) identify the total amount of contributions and loans received during the course of the campaign; (2) itemize any expenditures exceeding $100; and (3) identify the total amount of non-itemized expenditures. *Id.* § 7-6-207(b). Arkansas law prohibits campaign expenditures in excess of $50 being made in cash.

*Id.* § 7-6-204(a). Candidates certified that the information on the Reports was true and accurate to the best of their knowledge.

Thus, assuming the Defendant certified his submitted Reports truthfully, any and all cash expenditures made by the Defendant – whether they were: (1) cash loans to his own campaign; (2) non-itemized cash expenditures because they fell below the $50 threshold; or (3) cash expenditures that exceeded the $50 ceiling in violation of state law but should have otherwise been itemized on his Reports – should be reflected on the Reports, even if only listed in the aggregate as non-itemized expenses. Accordingly, the Defendant's campaign Reports, if filled out truthfully and accurately as he was required to do, should offer the Defendant reasonably available means for which he can obtain comparable evidence of his cash expenditures. To the extent the Defendant is willing to admit that the excel spreadsheets he now claims existed on the Sony laptop are inconsistent with the campaign Reports, the government submits that such evidence is in fact inculpatory of the Defendant's filing of falsified campaign reports rather than exculpatory.

Moreover, even if the Defendant spent significant quantities of cash on campaign expenditures that were not disclosed in his Reports as he was required to do, the Defendant can still seek records or testimony from those vendors he paid establishing the existence of those cash transactions.  Hutchinson has failed to establish that he cannot retrieve initial source documents or obtain testimony from campaign vendors he allegedly paid with cash.  The United States has obtained some documentation of campaign expenditures from campaign vendors during the investigation, but Hutchinson's sworn campaign filings, the FBI's investigation, the records, and interviews do not support Hutchinson's claims.

Finally, even assuming Hutchinson maintained the spreadsheets he claims existed, such spreadsheets could only detail expenditures through the summer of 2012.  Notably, Hutchinson

has produced no comparable spreadsheet explaining the cash withdrawn from his campaign account from mid-2012 through 2017 to corroborate his claim that he routinely kept such records.[17] The lack of such evidence further undermines his claims that such spreadsheets ever existed.

### b.    Emails

Hutchinson had a legislative email account whose servers were stored at the Bureau of Legislative Research in Little Rock and a personal email whose servers were stored at Oath Holdings, formerly known as Yahoo, Inc.  These were, and are, both readily accessible to him and constitute sources of evidence that would be available to him by other means.  There is simply no credence that can be given to his assertion that irreplaceable records were kept on the Sony laptop.

### c.    Individual-1's Text Messages

Even if the Court credits Defendant's unsupported and speculative claims that Individual-1's text messages contained potential impeachment evidence, he has not established that such alleged information would not be available through other reasonable means. Indeed, the United States obtained and produced as part of discovery in this case multiple communications belonging to Individual-1, including a search warrant return of Individual-1's email account. Nevertheless, because the evidentiary value of Individua1-1's text messages are unknown, Defendant must show the government acted in bad faith, which it clearly did not. *Youngblood*, 488 U.S. at 58 (holding where the exculpatory value of the evidence is unknown, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.)

---

[17] If Hutchinson attempts to admit any such spreadsheet into evidence at any hearing or at trial, the United States respectfully requests that Hutchinson be required to produce the original electronic version of such document to allow the United States and the Court to examine the metadata and creation date of said document and requests that the Court enforce defendant's reciprocal discovery obligations.

### 3.   Hutchinson has failed to establish that the images of the devices were destroyed in bad faith.

Hutchinson must demonstrate that the government acted in bad faith by destroying the images in order to assert a violation of the due process of law. *Tyerman*, 701 F.3d at 560 (affirming the district court's denial of motion to dismiss for destruction of a firearm, even where destruction was improper).   In this case, the imaged copies of the devices were destroyed pursuant to FBI policy after the FBI and the United States Attorney's Office closed their cases.   The United States provided a copy of the FBI policy to defense counsel in discovery.

In *Williams*, a detective took custody of a firearm seized in the investigation, and indicated the firearm was not intended to be used as evidence and could be released or disposed of on the inventory sheet.   577 F.3d at 880.   He explained he filled out the form in this way because a decision had been made that the defendant would not be arrested for possession of an illegal firearm.   *Id*.   The firearm was destroyed, and the defendant was subsequently indicted federally for being a felon in possession of a firearm.   *Id*.   The Eighth Circuit upheld the denial of the motion to dismiss the indictment based upon the destruction of the firearm concluding that the defendant was not deprived of the opportunity to present potentially exculpatory material.   *Id.* at 883.   The Court did not even need to reach the question of bad faith.   *Id*.   *United States v. Rasavanh*, 298 Fed. Appx. 531, 532 (8th Cir. 2008) (rejecting due process challenge when police destroyed physical evidence because of an honest mistake where there was no pending state prosecution and state officials had not determined whether there was a pending federal prosecution, and defendant produced no evidence of bad faith); *United States v. Einfeldt*, 138 F.3d 373, 377 (8th Cir. 1998) (upholding district court's denial of motion to exclude evidence where police destroyed evidence but provided reasonable explanations why each item was destroyed and there was no evidence of bad faith).

The fact that Agent Lowe followed normal procedures in authorizing the deletion of the images of the devices does not support an allegation of bad faith.  *Webster,* 625 F.3d at 447 (affirming district court determination that evidence was disposed of pursuant to policy and reckless destruction of evidence pursuant to policy does not equate to bad faith).  The Eighth Circuit has previously concluded that a defendant is not entitled to an evidentiary hearing where claims of bad faith and exculpatory evidence were "merely conjectural" and "a defendant merely puts forward unsupported, speculative accusations."  *United States v. Kuykendall*, 633 F.2d 118, 119-20 (8th Cir. 1980).

### F.      The Defendant's Interview was voluntary.

Defendant argues that his inculpatory statements to law enforcement were coerced and therefore involuntary.  Hutchinson, in sum, claims that the FBI overwhelmed his will and caused an involuntary statement when they did not inform him of the true reason for the interview and "made promises of leniency."  Defendant's claims are without merit.

The United States must prove by a preponderance of the evidence that the challenged statements were voluntary. *United States v. Astello,* 241 F.3d 965, 966 (8th Cir. 2001).  "The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired."  *Id*. at 967 (quoting *United States v. Kilgore*, 58 F.3d 340, 353 (8th Cir. 1995)).  In making this determination, the Court considers the totality of the circumstances in assessing the conduct of law enforcement officials and the defendant's capacity to resist pressure to confess.  *Id*.  However, the Eighth Circuit has recognized that "[o]bviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession. In order to obtain the desired result, interrogators use a laundry

list of tactics." *Id*. at 967. A "promise of leniency does not necessarily make a statement involuntary." *Id.* (citing *Kilgore*, 58 F.3d at 353).

### 1.    Defendant's Mental State

The Eighth Circuit has noted, "one of the key concerns in judging whether confessions were involuntary, or the product of coercion, [is] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne." *United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004) (quoting *Wilson v. Lawrence County,* 260 F.3d 946, 952 (8th Cir. 2001)). The Eighth Circuit has generally "concluded that where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled." *Id*. (citing *United States v. Gallardo–Marquez,* 253 F.3d 1121, 1123–24 (8th Cir.) (concluding confession was voluntary where defendant was of average intelligence and had prior contact with law enforcement), *cert. denied,* 534 U.S. 1031, 122 S.Ct. 570, 151 L.Ed.2d 443 (2001); *Astello,* 241 F.3d at 968 (concluding that confession of an eighteen-year-old was voluntary where he had completed eleventh grade and possessed a capacity to understand what was being said during the interview); *Simmons v. Bowersox,* 235 F.3d 1124, 1134 (8th Cir. 2001) (concluding that confession was voluntary where defendant had full scale I.Q. of 88); *cf. Wilson,* 260 F.3d at 949 n. 4 & 952–53 (finding involuntary confession where defendant was mentally retarded, his overall mental abilities were in the bottom two percent of the population, and testimony revealed that he could be "talked into anything")).

The circumstances of Hutchinson's statement will control this analysis.  As Hutchinson notes in his Declaration, he is 44 years old, has a Bachelor's Degree in Economics and a Juris Doctor.  He has had a law degree since 2006.  He entered the legal profession as a practicing attorney almost immediately in 2006, later formed his own firm, and, as noted above, was a former

prosecutor.  The investigation has also revealed that Hutchinson has practiced some state criminal defense in addition to handling civil matters.  Judging by his passage of the Arkansas bar exam and his criminal defense practice, Hutchinson presumably understands his *Miranda* rights.  Hutchinson has a brother who is an FBI agent and, again according to him, at the time of his interview he had assisted the FBI in a previous investigation.  Furthermore, the Defendant neither claims to have been in custody nor that the Agent yelled at him, intimidated him, or threatened him with arrest or harsh criminal penalties.  The simple fact of the matter is that the Agent conducted the June 11, 2014 interview without coercive emotional manipulation, threats, or physical intimidation against Hutchinson.  It should also be noted that the inculpatory statements provided to law enforcement concerning the subject matter of this prosecution preceded any discussions for the Defendant to work as an informant.

In support of his argument, Hutchinson cites the *LeBrun* case in which the Eighth Circuit reversed a decision of the district court suppressing an inculpatory statement to law enforcement. *LeBrun*, 363 F.3d 715.  In that case, law enforcement did not inform the defendant of the subject of the investigation and the defendant believed law enforcement agents might be investigating his employer.  *Id*. at 718.  There, agents told LeBrun he would not be prosecuted if the killing (which was the subject of the investigation) was spontaneous.  *Id*. at 725.  Agents also utilized large photographs of LeBrun's life to psychologically manipulate the defendant and using the victim's family to elicit an apology.  *Id*. at 718-19, 725.

In upholding the confession as voluntary, the Court found that even if a reasonable person would view the agents' statements as a promise, a promise "is merely one factor in the totality of the circumstances."  *Id*. at 725.  The Court placed "substantial weight on the fact that LeBrun was a sophisticated individual with legal training," specifically one year of law school, and that LeBrun

"had a subjective understanding of his *Miranda* rights at the time of the interview."  *Id*. at 723, 726.  The Court further concluded the statement was voluntary because "LeBrun is an intelligent, calculating person who erroneously perceived a potential loophole in the prosecution's case and tried to take advantage of it by confessing," and it was "clear [] that LeBrun's capacity for self-determination was not impaired."  *Id*. at 727.

### B.    Promise of Leniency

The Eighth Circuit has previously noted that where a defendant is seeking to enforce a promise of leniency, the burden is on a defendant to show that a promise was made in the first instance.  *United States v. Barahona*, 990 F.2d 412, 419 (8th Cir. 1993) (overruled on other grounds) (citing *United States v. Weiss*, 599 F.2d 730, 736 (5th Cir. 1979)).  "Absent such a showing, there is no need to examine the nature or enforceability of the promise."  *Id*.  In *Weiss*, the Fifth Circuit emphasized that the proper inquiry was not whether or not the defendant had a *subjective* expectation of non-prosecution, but rather, "whether there was a promise held out to which the government, as a matter of fair conduct, might be bound."  599 F.2d at 738.

Here, Hutchinson admits that the Agent explained "he did not have the authority to grant [him] immunity" and that if the IRS chose to pursue him on the tax charges, they could. Hutchinson Declaration at ¶13. Yet, Hutchinson emphasizes that he recalls Agent Lowe stating his admitted criminal conduct would not be referred to the U.S. Attorney's Office and that it was this promise which caused his will to be overborne.

Furthermore, shortly after his interview, in July 2014, Hutchinson was authorized to become a Confidential Human Source, receiving the concurrence of the United States Attorney's office, and was given standard FBI admonishments.  *See* Exhibit 28 (CHS Admonishments). Those included a statement by the FBI that nothing was promised in exchange for his cooperation

except informing the relevant prosecuting entity of the lengths of his cooperation. The clear and consistent admonishments to the Defendant that he was still subject to the possibility of prosecution and that that decision would be made by the U.S. Attorney's Office belies his argument that the possibility of leniency from the FBI overbore his will in his initial interview and thereafter.

### G.   There is no cumulative effect that warrants dismissal.

Hutchinson asserts that the FBI violated his privacy interest, destroyed exculpatory evidence, and coerced an inculpatory statement from him. Hutchinson contends that, as a result, the conduct of the FBI was outrageous, and the case should be dismissed based upon the cumulative effects of the misconduct. As there was no Fourth Amendment violation, Hutchinson cannot establish that exculpatory evidence was destroyed, and his confession was voluntary, the Court need not reach this issue. However, even if all of Hutchinson's allegations were true, dismissal would not be an appropriate remedy.

"Outrageous Government conduct requires dismissal of a charge 'only if it falls within the narrow band of the most intolerable government conduct.'" *United States v. Bugh*, 701 F.3d 888, 984 (8th Cir. 2012) (quoting *United States v. Morse,* 613 F.3d 787, 792–93 (8th Cir. 2010)). "Because the drastic step of dismissing an indictment is a disfavored remedy, a district court may properly dismiss an indictment only if the prosecutorial misconduct (1) was flagrant, and (2) caused substantial prejudice to the defendant." *United States v. Manthei*, 979 F.2d 124, 126 (8th Cir. 1992) (quoting *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988)). "The Supreme Court, in addressing governmental misconduct, held absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *Id.* at 127 (quoting *United States v. Morrison*, 449 U.S. 361, 365 (1981)). When a defendant moves for the district court to dismiss an indictment based on outrageous

government conduct, it is the defendant's burden to prove the existence of such conduct, and if the defendant fails to present such evidence, the district court should deny the defendant's motion. *United States v. Larsen*, 427 F.3d 1091, 1094-95 (8th Cir. 2005).  *See also United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003); *United States v. Diaz*, 189 F.3d 1239 (10th Cir. 1999); *United States v. Asibor*, 109 F.3d 1023 (5th Cir. 1999).

Here, the United States' conduct does not rise to the level of "outrageousness" needed to prove a due process violation.  *See United States v. Pardue*, 983 F.2d 843, 847 (8th Cir. 1993). As argued above, there was no unlawful search, no unlawful destruction of evidence, or coerced confession, and thus, there can be no cumulative effect. Moreover, as argued *supra*, even if the Court finds the United States unlawfully searched the laptop or should have maintained the Sony laptop, the government acted in good faith at every step of the way and thus, the government's conduct is not of the kind that would "shock the conscience of the court."  *Id*.; *see also Russell*, 411 U.S. at 431-32. Accordingly, Hutchinson cannot meet the heavy burden warranting dismissal of the Indictment.

## **CONCLUSION**

For the reasons stated herein, the United States respectfully requests that the Court deny the Defendant's Motion to Dismiss Due to Government Misconduct and Motion to Suppress.

Respectfully submitted,

CODY HILAND                                  ANNALOU TIROL
United States Attorney                       Acting Chief, Public Integrity Section


STEPHANIE MAZZANTI (2006298)                 MARCO A. PALMIERI
PATRICK C. HARRIS (85069)                    D.C. Bar No. 981788
BEN WULFF (2005190)                          Trial Attorney
Assistant U.S. Attorneys                     Public Integrity Section
P. O. Box 1229                               Criminal Division
Little Rock, AR  72203                       U.S. Department of Justice
Telephone:  501-340-2600                     1400 New York Ave., N.W., 12th Floor
E-mail: Stephanie.Mazzanti@usdoj.gov         Telephone: 202-307-1475
                                             E-mail: marco.palmieri@usdoj.gov